[No. 41258. En Banc. September 10, 1970.]

HAYS MERCHANDISE, INC., *Respondent*, v. DALE R. DEWEY *et al., Appellants.**

*Walgren & Sexton*, by *Gary Sexton*, for appellants.

*Mont Clair Spear*, for respondent.

FINLEY, J.—This is an appeal from a judgment for the

*Reported in 474 P.2d 270.

sale price of a number of toys delivered by the Hays Merchandise, Inc., to the appellants Dewey.

Mr. Dewey operated Dewey's Fuller Paint Store in Bremerton, Washington. In the autumn of 1967, he decided to establish and stock a "Toyland" in his store for Christmas trade. Pursuant to this plan, he and his wife and children visited Hays Merchandise, a wholesale toy company, in Seattle. Mr. Woodring, an employee of Hays, met Mr. Dewey and his family at the company's display rooms, where they together selected toys. Almost all of the toys selected at that time were stuffed animals; Mr. Dewey was apparently particularly interested in having a good stock of stuffed or "plush" animals. Mr. Dewey and Mr. Woodring then discussed the purchase of other toy items which Mr. Woodring was to select. It was agreed that the estimated cost for all of the toys, including the stuffed animals, would be approximately $2,500 to $3,500.

Several shipments of toys were sent to Dewey's Fuller Paint Store during October and November. The number of stuffed animals included in these shipments fell well below the expectations of the Deweys. Indeed, although the question was disputed at trial, the trial court found that less than half of the stuffed animals anticipated by the Deweys were in fact delivered. The purchase price of the animals ordered was found to be a sum not exceeding $500. There is substantial evidence in the record to support this finding and it will not be disturbed on appeal.

Mr. Dewey repeatedly called Hays Merchandise, complaining that they were not receiving all of the stuffed animals ordered. He also complained personally to Mr. Woodring on the two occasions that autumn and winter when Mr. Woodring made periodic sales visits to the store. Mr. Dewey was assured each time that the items in question had been "back ordered," and would be forthcoming. Finally, shortly before December 1, Mr. Dewey called Mr. Woodring about the stuffed-animal order. Mr. Woodring gave approximately the same reply, at which point an exasperated Mr. Dewey said that they wanted no more toys.

Apparently this call was too late to stop another ship-

ment of toys which arrived several days thereafter. Mr. Dewey was advised by Mr. Woodring that there would be no problem with this one late unopened shipment which should be sent back. Mr. Dewey kept this shipment, along with a number of other unopened and unmarked boxes of toys. Other toys were priced and put on display for sale.

Several months later, another Hays salesman, Mr. Osterholt, visited the Dewey's store. (Mr. Woodring had been away from work for some time because of illness.) According to the unchallenged finding of fact of the trial court, Mr. Dewey advised Mr. Osterholt that they had authority from Hays Merchandise to return a considerable quantity of unmarked toys, amounting to a value of almost $2,000. Mr. Dewey then shipped these toys to Seattle, whereupon Hays Merchandise refused the shipment, and it was returned to Mr. Dewey.

Hays had earlier billed Dewey for $3,598.11, the amount outstanding on the account. When no payment was forthcoming, this action was commenced. After trial, judgment was rendered for $3,436.36. The difference in the two sums reflects a minor accounting error by Hays and the freight charges for the shipment of the toys back to Seattle and thence back again to Bremerton. In addition, the judgment provides for an additional $299.98 credit upon the return of the one shipment received after the cancellation. The Deweys appeal from that judgment.

All of the transactions involved took place after the effective date of the Uniform Commercial Code in Washington and, hence, are governed by the provisions of RCW 62A. The trial court held that the delivery of less than one half of the stuffed animals was not a "material breach" of the sales contract. Appellant Dewey contends that this finding is in error. His contention is based largely upon RCW 62A.2-608, which provides as follows:

Revocation of acceptance in whole or in part. (1) The buyer may revoke his acceptance of a lot or commercial unit whose non-conformity substantially impairs its value to him if he has accepted it

(a) on the reasonable assumption that its non-con-

formity would be cured and it has not been seasonably cured; or

(b) without discovery of such non-conformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances.

(2) Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects. It is not effective until the buyer notifies the seller of it.

(3) A buyer who so revokes has the same rights and duties with regard to the goods involved as if he had rejected them.

There is no question but that Dewey accepted the toys in question. The issue before this court is whether there was an effective revocation of acceptance. This, in turn, is dependent upon (1) whether the nonconformity substantially impaired the value of the total order to Dewey, and (2) whether notice of the revocation took place within a reasonable time.

Appellant presents an ingenious argument on the first of the above questions. He argues that he would have been entitled to initially reject the toys if they failed "in any respect to conform to the contract . . . " RCW 62A.2-601. He chose not to reject the toys, but rather reasonably assumed "that its non-conformity would be cured. . . . " RCW 62A.2-608. Since the nonconformity was not seasonably cured, he argues that he should be entitled to revoke acceptance on, generally, the same basis for which he could have rejected the toys. Consequently, he contends that the emphasis in RCW 62A.2-608 is properly upon "impairs its value *to him*" rather than upon "*substantially* impairs." In short, appellant would have this court adopt a largely subjective test; *i.e.*, Did the buyer *believe* that the value was substantially impaired?

The question is one of first impression in this court. Indeed, few, if any, appellate courts have considered this precise issue under UCC § 2-608.

■ Appellant's argument, based upon the need for a logical consistency between RCW 62A.2-608 and RCW 62A.2-601, is not persuasive. We are convinced that the emphasis is properly upon "substantially impairs . . . value" rather than upon " . . . impairs its value to him." This does not mean that "substantial impairment" is to be determined without reference to the objective needs and expectations of the buyer. *See* RCWA 62A.2-608, Official Comment 2. But it is an objective factual determination of the buyer's particular circumstances rather than some unarticulated desires.

■ The question of whether or not there is such a substantial impairment is a factual determination to be made by the trial court. This is in accord with the result of most of the few cases which have considered the interpretation of UCC § 2-608. *See, e.g.*, *Campbell v. Pollack,* 101 R.I. 223, 221 A.2d 615 (1966) (evidence warranted trial court finding that omission of key equipment in sale of car-wash was substantial impairment); *Rozmus v. Thompson's Lincoln-Mercury Co.,* 209 Pa. Super. 120, 224 A.2d 782 (1966) (remanded for factual finding by trial court as to whether defect in car was substantial impairment); *L. & N. Sales Co. v. Stuski,* 188 Pa. Super. 177, 146 A.2d 154 (1958) (case remanded to allow jury determination of factual question of whether defect in beverage dispensers was substantial impairment). *But see Lanners v. Whitney,* 247 Ore. 223, 428 P.2d 398 (1967) (Supreme Court made factual finding of substantial impairment after required de novo review of record in suit in equity).

There are some similarities between the contract in the instant case and a contract which could be clearly described as an installment contract. For example, the trial court found that multiple lot deliveries were contemplated by the parties; and, delivery was in fact made in multiple installments. It is of some passing interest in this connection, by analogy, that RCW 62A.2-612, governing procedures applicable in the event of breach of an installment contract, uses similar language. Under that section, when delivery in separate lots is authorized, to be separately

accepted, a nonconforming lot may be rejected only "if the non-conformity *substantially impairs the value* of that installment. . . . " As noted by Washington Law Review, The Uniform Commercial Code in Washington 156 (1967), "This differs from the approach taken in non-installment contracts wherein the buyer may reject 'for any reason'." The phrase, "substantially impairs . . . value," is also used in RCW 62A.2-616; it obviously is a term chosen with care.

■   We are convinced that the question of "substantial impairment of value to [the buyer]" is best determined as a factual question by the trial court based upon all objective evidence properly before that court. In the instant case, the trial court's finding that there was no "material breach," while perhaps inartfully phrased, is in essence a finding that there was no substantial impairment. Our general rule is that findings of fact must be accepted as verities unless there is no substantial evidence in the record to support them. *Friedlander v. Friedlander,* 58 Wn.2d 288, 362 P.2d 352 (1961). Appellant has not presented any considerations in the instant case which would lead this court to depart from that rule.

■   There remains the question of whether the notice of revocation was given within a reasonable time. Under the code, there is a distinction between notice of breach (RCW 62A.2-607(3)) and notice of revocation of acceptance (RCW 62A.2-608(2)). There is no question but that there was adequate and timely notice of breach. That, however, is not the question before this court. The notice of revocation of acceptance need not be in any particular form, but it must at least inform the seller that the buyer does not want the goods and does not desire to retain them. With the exception of the last small lot, there is no indication that the Deweys gave this notice prior to mid-February, when they attempted to return the unmarked and unsold toys. Indeed, the Deweys advertised the "Toyland" and attempted to sell the toys during December. It was not until a considerable time after Christmas that they attempted to return the toys. In view of the seasonal nature of the toy business and

the somewhat faddish demand for certain toys, this delay in giving notice was unreasonable.

Even if the notice of revocation had been given in early December and if this were considered timely, the buyer's subsequent acts of dominion over the goods are inconsistent with such claimed revocation. The buyer's acts of pricing, displaying, advertising and selling were for his own account and were not in keeping with his duty to use reasonable care in holding the goods at the seller's disposition for a reasonable time. See RCW 62A.2-606(1)(c); *Holland Furnace Co. v. Korth*, 43 Wn.2d 618, 262 P.2d 772, 41 A.L.R.2d 1166 (1953).

The judgment of the trial court is affirmed.

HUNTER, C. J., ROSELLINI, HAMILTON, HALE, NEILL, McGOVERN, and STAFFORD, JJ., and DONWORTH, J. Pro Tem., concur.