423 A.2d 355

**William O. CARDWELL and Iva M. Cardwell, his wife,**

**v.**

**INTERNATIONAL HOUSING, INC., t/d/b/a Palm City Mobile Homes, Appellant.**

Superior Court of Pennsylvania.

Argued March 19, 1979.

Filed Dec. 1, 1980.

500

Harry W. Reed, Jr., Lebanon, for appellant.

Bruce A. Grove, Jr., Harrisburg, for appellees.

Before PRICE, SPAETH and LIPEZ, JJ.

PRICE, Judge:

The instant appeal is from a judgment in the trial court awarding appellees $6,404.98 in their suit in assumpsit to rescind a contract for the purchase of a mobile home and awarding appellant $179.19 in its counterclaim. Finding the evidence insufficient to support appellees' cause of action, we reverse.

On September 9, 1971, appellees executed an agreement to purchase a two–bedroom mobile home from appellant. Although not incorporated into the agreement, testimony established that appellees had been shown and agreed to purchase a 1971 PMC mobile home, manufacturer's serial number ending in the last three digits 230. On September 22, 1971, an installment sales contract was executed by the parties. This agreement, however, listed the home as a 1971 PMC mobile home, serial number 277. Appellant then assigned the financing contract to a local bank and warranted its enforceability.

In late September 1971, appellees moved from their former residence in Maryland to appellant's mobile home park in Lebanon County with the expectation that the two–bedroom number 230 home would be situated in the park. Instead of finding the two–bedroom home, appellees found a three–bedroom mobile home, serial number 277. They immediately notified appellant and the financing bank that a mistake had been made. Because they were without accommodations, however, appellees moved into the three–bed-

room mobile home, whereupon they discovered numerous major defects in its construction. After repeated complaints were made to appellant regarding the defects in the number 277 home and their desire to obtain the number 230 two–bedroom home, appellees were instructed by appellant to select another home which would be installed in a newly constructed portion of appellant's mobile home park. Appellees selected a two–bedroom mobile home serial number 228, and it was installed in August of 1972. Upon moving into this home, appellees discovered that it did not include various furnishings that had been promised and that it had various defects.

In November 1972, appellant requested appellees to execute the certificate of title to the number 277 three–bedroom home that had been previously occupied by appellees. Appellant had found a purchaser for the home, but was unable to complete the transfer until appellees signed the certificate of title. Appellees refused to sign the certificate claiming that they would not execute any papers until the defects in the number 228 home in which they were then residing were rectified. Relations between the parties continued to deteriorate, and appellant's records indicate that the final service call on the number 228 home took place in May of 1973. Thereafter, throughout 1973, appellees ignored appellant's repeated correspondence requesting that they sign the certificate of title to the model 277 home, apparently on the basis of appellant's failure to correct the defects in the model 228 home.

In or about January of 1974, appellant initiated a criminal proceeding under section 207 of the then–applicable Vehicle Code on the basis of appellees' refusal to effectuate a transfer of the certificate of title to the number 277 mobile home. *See* Act of April 29, 1959, P.L. 58, § 207, *as amended* 75 P.S. § 207(a) (1971), *repealed and replaced,* 75 Pa.C.S. § 1111(a). In response to that complaint, appellees retained counsel, who advised them to sign the certificate of title to the three–bedroom mobile home.

Appellees' counsel then entered into negotiations with appellant to resolve the dispute over the number 228 two–bedroom mobile home. Appellees' attorney posted a letter to appellant's counsel on May 29, 1974, in which he asserted that the number 228 two–bedroom mobile home was in used condition, listed various defects and stated that his clients "want what they bargained for, namely, a *new* P.M.C. mobile home." (Record at 361a) (emphasis in original). By another letter on June 14, 1974, appellees' attorney inquired as to the position of appellant and stated that "[s]hould I not have a written reply from you within 10 days of this letter, I shall presume that you wish me to follow the formal litigation route and I will immediately do so." (Record at 363a). Three days later, on June 17, 1974, appellant's counsel responded, in part, as follows:

"I had forwarded your letter of May 29 to International Housing, Inc., and further, spoken to Lee Heisey, Secretary of International Housing, Inc., in regard to getting in touch with Mr. John Kuhn [then president of appellant] in an effort to piece together the facts of this case. As of this date, Mr. Heisey is still attempting to assemble relevant information pertaining to your claim but, apparently has had little co–operation from Mr. John Kuhn in this matter. I hope that you can persuade Mr. Cardwell to be patient until we have had an opportunity to carefully review the merits of his complaints." (Record at 364a).

Testimony established that the parties did not engage in additional negotiations thereafter.

On March 14, 1975, appellees filed suit alleging breach of the original sales agreement by appellant. Preliminary objections were filed and dismissed, and after an unexplained delay, appellant filed its answer and counter–claim on January 17, 1977. On the advice of counsel, appellees continued to reside in the mobile home until June 1975,[1] when they

---

1. The testimony regarding the date appellees vacated the home was conflicting. Elizabeth Miller, appellant's general manager, testified initially that appellees left the home in June or July of 1975. She later testified, however, that appellees were present when the mobile home was repossessed in October 1976, and removed some of their

were forced to vacate the home and leave it in appellant's park after appellant evicted them for violation of certain regulations governing the mobile home park. Thereafter, they continued to make payments on the home until February 1976.[2] The home was finally repossessed by appellant in October 1976.

When the case came to trial, the court instructed the jury that appellees could recover on either of two theories: (1) that they never accepted the two–bedroom number 228 home in August 1972 as a substitute for the number 230 originally promised; or (2) that they accepted the home but subsequently revoked their acceptance as a result of the defects. At the close of trial, the jury returned a verdict awarding appellees $6,404.98, representing the amount they had paid to appellant for the home, and for appellant on its counterclaim for $171.19, representing rent at its mobile home park for three months at the rate of $53.00 per month plus $12.19 for parts installed by one of its repairmen in fixing a defect in the furnace of the number 228 home. Appellant now appeals alleging that the evidence was insufficient to sustain the award under either theory upon which the case was submitted to the jury, and thus, the trial court erred in refusing its motion for judgment non obstante veredicto. We agree, but as indicated in our discussion below, reverse and remand for a new trial.

Before addressing appellant's contentions, we initially note that our standard of review in an appeal from a trial court's refusal to enter judgment n. o. v. is to view the evidence, and all inferences reasonably deducible therefrom,

possessions from the home at that time. Appellee William Cardwell stated that appellees continued to reside in the home until the time of repossession in October of 1976. In light of these contradictory statements, the jury apparently determined that appellees vacated the home in June 1975, because appellees had ceased making rental payments in March 1975, and the verdict on appellant's counterclaim included rent at appellant's mobile home park only for the months of April, May and June of 1975.

2. The payment made in February 1976, was credited for December 1975, since appellees were approximately two months delinquent in the mobile home payments.

in the light most favorable to appellees as the verdict winners. *See, e. g., Gonzalez v. United States Steel Corp.,* 484 Pa. 277, 398 A.2d 1378 (1979); *Atkins v. Urban Redevelopment Auth.,* 263 Pa.Super. 37, 396 A.2d 1364 (1979). Moreover, we note that a mobile home has been held to fit within the definition of "goods" in section 2–105 of the Pennsylvania Uniform Commercial Code, Act of April 6, 1953, P.L. 3, § 2–105, *amended,* Act of October 2, 1959, P.L. 1023, § 2, 12A P.S. § 2–105 [hereinafter U.C.C.] *see Duffee v. Judson,* 251 Pa.Super. 406, 380 A.2d 843 (1977), and in the absence of a contrary agreement, the provisions of the U.C.C. will govern in interpreting the transaction between the parties. *See* U.C.C. section 1–102(3).

Acceptance of Number 228 Mobile Home as a Substitute

■ Although the trial judge instructed the jury to determine whether appellees agreed to accept the number 228 home as a substitute for the number 230, we note that neither party on appeal has addressed the issue whether the award may be supported based upon this theory. Indeed, appellees by their own admissions appear to have conceded that the verdict may not be supported on that basis. At trial, appellee William Cardwell testified that after appellees rejected the three–bedroom number 277 mobile home, he was instructed by appellant in August 1972 to select a new two–bedroom home for installation in appellant's park. He selected and agreed to accept the two–bedroom number 228 home as a substitute for the number 230 provided that it was "okay."[3] Thereafter, no one associated with appellant made any promises that appellees would receive the number 230 home that was the subject of the original agreement. Moreover, William Cardwell also testified that he would have been content simply to have the defects in the model

3. In this respect, we do not attach any significance to the statement by appellees that acceptance of the number 228 home in August 1972, was conditioned upon it being "okay." This additional caveat did not affect the efficacy of the acceptance as a substitute for the number 230 home, and did not expand appellees already existing rights under sections 2–601 or 2–608 to later reject the home due to the breach of the implied warranty of merchantability under section 2–314 as a result of the latent defects.

228 mobile home repaired. Thus, by their own evidence, appellees conceded that they abandoned their rights under § 2–601 of the U.C.C. to reject the mobile home as nonconforming to the original contract calling for delivery of the number 230 home. *See* U.C.C. § 2–607(2).

Revocation of Acceptance

With respect to the second contention, appellant alleges that the evidence was insufficient to support recovery on the theory that appellees revoked their acceptance of the number 228 home as a result of the defects in the home because: (1) appellees did not notify appellant that they were revoking their prior acceptance; (2) there was no offer or tender after the revocation, if any; (3) the revocation, if any, occurred after an unreasonable passage of time; and (4) the use of the mobile home for a number of years constitutes an acceptance precluding revocation.[4] Before undertaking an analysis of these contentions, we must review the trial court's determination that appellant waived these defenses

4. Throughout their briefs, both parties analyze the actions of appellees as one of "rejection" of the home due to the latent defects rather than as a revocation of acceptance. The distinguishing feature between rejection under section 2–601 of the U.C.C. and revocation of acceptance under section 2–608 is whether there has been an acceptance of the goods under section 2–606. *See Zabriskie Chevrolet, Inc. v. Smith*, 99 N.J.Super. 441, 240 A.2d 195 (1968). While the nonconformity of the number 228 home to the original contract calling for delivery of the number 230 home cannot be used to dispute acceptance under section 2–606(1)(a), argument could be made that appellees never accepted the home due to the nonconformity arising from the latent defects. Thus, the "rejection" analysis employed by the parties may be technically correct. Because, however, the trial judge submitted the case to the jury on a revocation of acceptance theory, and to avoid confusion between a rejection due to a failure to deliver the original number 230 home as opposed to the rejection due to the nonconformity arising from the latent defects, we prefer, for purposes of this opinion, to characterize the latter situation as one of revocation of acceptance. This characterization does not affect the proper analysis or the ultimate result since the rights and duties of a buyer revoking acceptance under section 2–608 are the same as a buyer rejecting the goods under section 2–601. *See* Section 2–608(3); *Stroh v. American Recreation & Mobile Home Corp.*, 35 Colo.App. 196, 530 P.2d 989 (1975).

by failing to specifically allege them in the new matter section of its answer to appellees' complaint.

■ Appellees' complaint, filed in March of 1974, merely alleged that appellant breached the contract of sale by its failure to deliver the number 230 mobile home that had originally been agreed upon and its delivery of first a used three–bedroom home and then a used two–bedroom home, and specified various defects in the two–bedroom home. Appellees also alleged that at the time appellant delivered the two–bedroom home in August of 1972, and on numerous occasions thereafter, appellees continued to object that they had not received the number 230 home that had been the subject of the original agreement of sale. Thus, by their own pleadings, appellees appeared to be proceeding upon only one theory–that they never accepted the number 228 mobile home as an accommodation for the number 230 home.[5] In response to the complaint, appellant averred that appellees requested the delivery of the number 228 mobile home in August 1972, that the home was new and not used, and that appellees had accepted it.[6]

5.  The relevant portions of appellees' complaint are as follows:
"7.   Instead of delivering the Mobile Home contracted for, afore-mentioned, the Defendant delivered to the Plaintiffs a used three bedroom Mobile Home which Plaintiffs were compelled to reside in until August of 1972, when the Defendant replaced the three bedroom home with a used two bedroom PMC Mobile Home.
8.   The Plaintiffs advised the Defendant, upon its delivery to them in August of 1972 of the used two bedroom PMC Mobile Home, that they had not yet been given that which they had bargained for, namely, a new 1971 PMC (two bedroom) Mobile Home, yet the Defendant refused, and continues to refuse, to deliver to the Plaintiffs that which they had contracted to purchase.
11.   The Plaintiffs, WILLIAM O. CARDWELL and IVA M. CARDWELL, have continuously demanded that the Defendant deliver to them the new Mobile Home that was the subject of the contract, aforesaid.  Similar demands were also made on behalf of the Plaintiffs by their counsel herein as well as by their financing institution, the Valley Trust Company of Palmyra, Pennsylvania. The Defendant has, however, at all times steadfastly refused and still refuses to deliver to the Plaintiffs a new 1971 PMC (two bedroom) Mobile Home."

6.  The pertinent responsive pleadings were as follows:

At trial, appellees abandoned their earlier strategy that they had never accepted the number 228 home and proceeded under a theory that although they had accepted the number 228 home in substitution for the number 230 home, they subsequently revoked that acceptance on the basis of the latent defects.[7]  In support of this theory, appellees

"7.  Admitted in part and denied in part.  It is admitted that the Defendant delivered to the Plaintiffs a three bedroom mobile home and, upon the Plaintiffs' request, replaced the three bedroom mobile home with a two bedroom PMC Mobile Home.  It is denied that either the three bedroom mobile home or the two bedroom PMC Mobile Home was in a used condition.  On the contrary, both the three bedroom mobile home and the two bedroom PMC Mobile Home supplied to the Plaintifffs by the Defendant were new at the time of delivery to the plaintiffs.

8.  Admitted in part and denied in part.  It is admitted that the Defendant delivered to the Plaintiffs a two bedroom PMC Mobile Home.  It is denied that the 1971 PMC (two bedroom) Mobile Home was a used mobile home and it is denied that the Plaintiffs were not given the mobile home they contracted for.  On the contrary, the Defendant delivered the new two bedroom 1971 PMC Mobile Home to the Plaintiffs according to the Purchase Agreement between the parties and performed all of its obligations under the Contract.

11.  Admitted in part and denied in part.  It is admitted that the Plaintiffs have demanded that the Defendant deliver to them a second new 1971 PMC (two bedroom) mobile home.  It is denied that the Plaintiffs' counsel has made such demands upon the VALLEY TRUST COMPANY.  Defendant has no knowledge of such demands upon the VALLEY TRUST COMPANY.  Such information is within the exclusive knowledge of the Plaintiffs.  If material, proof thereof is demanded.  It is further denied that the Defendant has refused to deliver to Plaintiffs a new 1971 PMC (two bedroom) Mobile Home.  On the contrary, such delivery has been made by the Defendant and Defendant has fulfilled all of its obligations under the aforementioned Contracts between the parties."

7.  The first mention by appellees of their new theory was at the completion of the presentation of their case–in–chief when, in response to appellant's motion for compulsory nonsuit, appellees' counsel stated, "The thrust of my case is recission [sic] of the contract and restitution of all payments made to the bank from day 1 of the contract." (N.T. 167).  On appeal, appellant has not expressly asserted the variance between the theory of recovery alleged in the complaint and the theory actually presented at trial as a basis for judgment n. o. v., and we would be reluctant to reverse the judgment on that basis even if it had been alleged since appellant was not surprised or prejudiced in its presentation of a defense by the

presented evidence to establish that the home was defective, that appellees had continually objected regarding the defects and that on May 29, 1974, their counsel sent a letter to appellant stating that appellees wanted a new mobile home to replace the number 228 in which they were then residing. Thereafter, the judge submitted the case to the jury on appellees' new strategy and specifically instructed them that any revocation of acceptance must be made within a reasonable time after discovery of the basis for revocation, that notice of such revocation must be made to the seller and that once revocation is made the buyer cannot exercise any right of ownership in the goods.

In light of the above summary, we cannot agree that appellant waived the defenses discussed earlier. The initial complaint filed by appellees alerted appellant to only one theory of recovery and it was to this theory that appellant responded in its answer. When appellees at trial proceeded upon a different theory relating to the revocation of acceptance of the number 228 home by virtue of the defects, and the trial court instructed the jury on the elements necessary for a proper revocation, appellant in its post–trial motions posited objections that certain of the elements had not been established. Under this statement of facts, we cannot agree with the trial court that appellant waived the defenses to the revocation theory by failing to plead them in its answer when that theory was not presented in the original complaint.[8]

variance. *See, e. g., Freer v. Parker*, 411 Pa. 346, 192 A.2d 348 (1963); *Smith v. Allegheny County*, 397 Pa. 404, 155 A.2d 615 (1959).

8. The trial court found that the instant proceeding was governed by this court's decision in *Stimely v. Dutchmen Mobile Homes*, 240 Pa.Super. 626, 361 A.2d 733 (1976), in which the plaintiff rejected a mobile home as a result of various defects. In her complaint, the plaintiff in *Stimely* alleged that she had rejected the home in conformity with the provisions of the U.C.C., and that such rejection was timely. In its answer, the defendant denied that the rejection had been made pursuant to the U.C.C., but failed to deny that the notice of rejection had been sent within a reasonable time. In holding that the defendant was not entitled to a jury instruction regarding the timeliness of the rejection, we relied upon Pa.R.C.P. No. 1029(b), which provides that the absence of an express or

### Notice of Revocation

Appellant's first challenge to the revocation of acceptance theory is that appellees never informed appellant that they were revoking their acceptance as a result of the defects. Under section 2–608(2) of the U.C.C., a party revoking a prior acceptance of goods found to be defective must notify the seller within a reasonable time of the revocation. A party gives notice "to another by taking such steps as may be reasonably required to inform the other in ordinary course," U.C.C. section 1–201(26), and "[a] person has 'notice' of a fact when ... from all the facts and circumstances known to him at the time in question he has reason to know that it exists." U.C.C. section 1–201(25). In establishing the appropriate standard for giving notice, comment 5 to section 2–608 employs the criteria of "good faith, prevention of surprise and reasonable adjustment", and provides that "[f]ollowing the general policy of this Article, the requirements of the content of notification are less stringent in the case of a non–merchant buyer," although the same comment states that merely objecting to defects in the goods does not, without more, constitute notice that the buyer is revoking his acceptance.

Examining the evidence in light of the above parameters, we conclude that the letter from appellees' counsel on May 29, 1974, while perhaps lacking the clarity of purpose expected of a trained counselor in a commercial transaction, could have reasonably been construed by the jury as a revocation

implied denial in an answer of an averment contained in a complaint shall be deemed an admission as to the truth of the averment. Thus, despite the defendant's boiler–plate denial that rejection was made pursuant to the U.C.C., his failure to specifically deny the averment as to the timeliness of the rejection (a requisite element for proper rejection under the U.C.C., see section 2–602), constituted an admission as to the timeliness issue.

We find that *Stimely* does not control the present case. In their complaint, appellees failed to allege the revocation of acceptance theory and at no time alleged that notice of revocation had been made or that the revocation had occurred within a reasonable time. Thus, appellant's failure to allege lack of notice or undue delay, or the other defenses relating to the revocation theory therefore cannot be deemed to have been an admission or waiver under the rule of *Stimely* or Pa.R.C.P. No. 1029(b).

of acceptance by appellees.[9]  That notice expressed appellees' dissatisfaction with the condition of the home and stated that appellees would not be satisfied until they received a new two–bedroom home.  Thus, by this correspondence and the attendant circumstances appellant had "reason to know" that appellees had revoked their prior acceptance.

## Unreasonable Delay

■  Appellant next contends that appellees' revocation of acceptance violated U.C.C. section 2–608(2), which requires revocation to take place "within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in the condition of goods which is not caused by their own defects."  Appellant alleges that the delay from August 1972 until May 1974 in revoking acceptance of the home constitutes an unreasonable delay as a matter of law.[10]  We disagree.

Section 1–204 of the U.C.C. establishes that "a reasonable time for taking any action depends on the nature, purposes

9.  We note that at least one court has held that the initiation of an action to rescind a contract can be construed as providing notice of a revocation of acceptance.  *See Fenton v. Contemporary Development Co.*, 12 Wash.App. 345, 529 P.2d 883 (1974).  Unfortunately, appellees' complaint filed in March of 1975, did not proceed upon a rescission theory, and was limited to an allegation that they had never accepted the number 228 home in August 1972.  Thus, any notice inherent in the complaint was limited by the restrictive nature of that pleading.  Moreover, because the letter of May 29, 1974, could be construed as a more definite expression of revocation and because this correspondence occurred at a date prior to the filing of the complaint in March of 1975 and thus would be more beneficial to appellees in resolving the issues of notice and reasonable time discussed *infra*, we presume that the jury determined that the letter of May 29, 1974, was a revocation of acceptance.

10.  In actuality, appellant's challenge was to the delay from appellees' initial acquisition until 1976 on the assumption that they had not manifested an effective revocation of acceptance.  Because, however, appellees cannot be assessed with the time period from September 1971 until August 1972 when they resided in the number 277 three–bedroom home and because we have concluded that appellees' letter of May 29, 1974, may be construed as a revocation of acceptance of the number 228 home, we will address appellant's challenge as encompassing only the time period from August 1972 until May 1974.

and circumstances of such action." What is a reasonable time is generally determined to be a question of fact to be resolved by the jury. *See Land v. Huffman Manuf. Co.*, 420 F.Supp. 459 (M.D. Ala. 1976); *Newton v. Burks*, 139 Ga.App. 617, 229 S.E.2d 94 (1976); *Lish v. Compton*, 547 P.2d 223 (Utah 1976); *cf. Necho Coal Co. v. Denise Coal Co.*, 387 Pa. 567, 128 A.2d 771 (1957) (interpreting reasonable time provision of Uniform Sales Act). Among the factors to be considered in determining the passage of a reasonable time for revoking acceptance is whether the seller attempted to correct the nonconforming nature of the goods. In such a situation, a buyer will not be penalized for affording the seller an opportunity to correct the defects and the time for revoking acceptance "should extend . . . beyond the time in which notification of breach must be given, beyond the time for discovery of non–conformity after acceptance and beyond the time for rejection after tender." U.C.C. section 2–608, comment 4. Applying this standard, delays in excess of two years have been held not to constitute an unreasonable delay for revoking acceptance. *See Dopieralla v. Arkansas Louisiana Gas Co.*, 255 Ark. 150, 499 S.W.2d 610 (1973); *Gramling v. Baltz*, 253 Ark. 361, 485 S.W.2d 183 (1972); *Fablok Mills, Inc. v. Cocker Machine & Foundry Co.*, 125 N.J.Super. 251, 310 A.2d 491, *cert. denied*, 64 N.J. 317, 315 A.2d 405 (1973).

In the instant case, appellees notified appellant of the defects in the trailer shortly after they began residing in the home in August 1972, and appellant's repairmen expended considerable effort to correct the defects until May 1973. Thereafter, appellant continued to be aware of appellees' dissatisfaction with the mobile home through 1973 and 1974 based upon appellees' refusal to sign the application for the certificate of title to the three–bedroom number 277 mobile home, and commencing in January 1974, appellees' attorney negotiated with appellant to placate appellees' objections and to cure the nonconformities in the home in return for appellees' agreement to execute the title application for the number 277 home. Thus, appellant continued to be made aware of appellees' dissatisfaction with the home. More-

over, the evidence was not so clear that the deteriorated condition of the goods was caused by the passage of time before revoking acceptance rather than as a result of damages stemming from the latent defects. As such, we cannot conclude as a matter of law that the twenty–one month delay from August 1972 until May 1974 before revoking acceptance was unreasonable within the meaning of U.C.C. section 2–608(2).

## Tender After Revocation

■ Appellant next contends that appellees' failure to offer the return of the mobile home after any revocation of acceptance precludes recovery on that theory. While formerly an offer to return the consideration acquired from the other party was a condition precedent in an action to "rescind" a contract, this rule was equitable in nature and was not enforced to perpetrate an injustice. *See Sloane v. Shiffer*, 156 Pa. 59, 27 A. 67 (1893); *Arbuthnot v. Smith*, 18 Pa.Super. 22 (1901). Moreover, this rule has been changed by the Uniform Commercial Code. Under section 2–608(3) a buyer who revokes acceptance has the same rights and duties with respect to the goods as a buyer who has never accepted them and has rejected them under section 2–602. The duties specified under section 2–602(2)(b) require only that the buyer hold the goods with reasonable care to permit the seller to remove them, and there is no obligation to formally tender the goods back to the seller. *McCormick v. Ornstein*, 119 Ariz. 352, 580 P.2d 1206 (Ct.App.1978); *Testo v. Russ Dunmire Oldsmobile, Inc.*, 16 Wash.App. 39, 554 P.2d 349 (1976). In addition, under section 2–711, a buyer who has rightfully revoked acceptance has a security interest in the goods in his possession to the extent of any payments made, and may retain the goods and even sell them to recover the value of his security interest. Therefore, appellees were not required to tender the mobile home back to appellant as a condition precedent to revoking acceptance.

## Reacceptance After Revocation

■ Finally, appellant contends that appellees' actions subsequent to May of 1974 were inconsistent with its earlier

revocation and established their dominion over the goods inconsistent with appellant's ownership thus effecting reacceptance of the home under sections 2–602(2)(a) and 2–606.[11] As previously stated, U.C.C. section 2–711 provides as a remedy for a buyer revoking acceptance the retention of the goods in his possession for the protection of his security interest. While the underlying purpose of section 2–711 could reasonably be construed as imposing a requirement that the buyer proceed expeditiously to sell the property and recover the value of his investment, *see Bowen v. Young*, 507 S.W.2d 600 (Tex.Ct.App.1974), courts in other jurisdictions have not imposed this requirement, *E. g., Mobile Home Sales Management, Inc. v. Brown*, 115 Ariz. 11, 562 P.2d 1378 (Ct.App.1977); *Keen v. Modern Trailer Sales, Inc.*, 40 Colo.App. 527, 578 P.2d 668 (1978); *Jorgensen v. Pressnall*, 274 Or. 285, 545 P.2d 1382 (1976). Even retention and use of a mobile home through completion of litigation and absence of an effort to sell has been held not to establish conclusively a reacceptance. *See Keen v. Modern Trailer Sales, Inc., supra*, and cases cited therein. Thus, we must determine whether appellees' actions subsequent to revocation of acceptance went beyond a mere retention as protection for their security interest or conclusively established a reacceptance as a matter of law.

In *Fablok Mills, Inc. v. Cocker Machine & Foundry Co., supra*, plaintiff purchased ten manufacturing machines over a period from September 1964 until June of 1965. Defects were noted in the first two machines that were delivered, yet plaintiff accepted eight additional machines under an assurance from the defendant manufacturer that the defects would be corrected. Despite defendant's efforts, the defects remained. On May 23, 1967, plaintiff revoked its prior acceptance, demanded the return of its money and requested

---

**11.** Appellant's actual claim was that the actions detailed *infra* indicate further evidence of an initial acceptance by appellees, under an assumption that appellees had never actually revoked their acceptance. Because, however, we have held that appellees revoked their initial acceptance in May of 1974, we will analyze appellees' challenged action subsequent to that time as a reacceptance.

that the machines be repossessed, but the defendant refused. Thereafter, plaintiff continued to use some of the machines while replacing others and putting them in storage. In holding that plaintiff's continued use after revocation would not bar his claim for revocation of acceptance, the court noted that the actions of appellant were reasonable under the circumstances since defendant was the only domestic manufacturer of this type of machine and the "plaintiff– buyer was confronted with the grim choice of either continuing to use some of the machines or going out of business." *Id.* at 258, 310 A.2d at 495. Similarly, continued use of a mobile home after revocation of acceptance has been deemed a reasonable course of action when the revoking buyer does not have substitute accommodations. *See Jones v. Abriani,* 169 Ind.App. 556, 350 N.E.2d 635 (1976); *Minsel v. El Rancho Mobile Home Center, Inc.,* 32 Mich.App. 10, 188 N.W.2d 9 (1971). Moreover, such continued use in the situations described would appear reasonable as a means of mitigating any incidental damages recoverable under section 2–714(2) if the revocation of acceptance is subsequently found to have been justified. It is only when the buyer's actions with respect to the chattels are deemed unreasonable that a court will invalidate a revocation of acceptance and deem the subsequent actions to be a reacceptance under section 2– 606(1)(c).

An example of such unreasonable action is illustrated by the case of *Fargo Machine & Tool Co. v. Kearney & Trecker Corp.,* 428 F.Supp. 364 (E.D.Mich.1977). In that case, machinery was delivered in August of 1971 at which time defendant paid $75,000 of the approximately $153,000 sale price. Defects were discovered immediately and plaintiff's repairman expended considerable time attempting to correct them. Defendant initially refused to make further payments on the machine until the defects were repaired, but in or about February 1972, agreed to pay approximately $28,- 000 on the outstanding balance in return for plaintiff's promise that it would continue to service the machines despite the expiration of the warranty period. Further

repairs were attempted, the last on March 21, 1973, but to no avail. During this period from February 1972 until March 1973, defendant rejected all requests by plaintiff to make further payments on the outstanding principal. On April 6, 1973, plaintiff filed suit to collect the approximately $50,000 still owing under the contract. Defendant counter–sued alleging breach of warranty, but during the pre–trial stage amended its cause of action to allege a revocation of accept- 'ance. In holding, *inter alia*, that defendant's actions subsequent to revocation of acceptance precluded recovery, the court noted that defendant never attempted to procure substitute machinery despite its availability, continued to make payments despite its protests as to defects, permitted additional service calls to be made after notice of revocation and continued to utilize the machines throughout the course of litigation. The court concluded by stating,

> "Fargo did not merely temporarily delay discontinuing use because of exigent circumstances, but rather, appears to never have intended to take the [machinery] out of production." *Id.* at 378.

*See Hays Merchandise, Inc. v. Dewey*, 78 Wash.2d 343, 474 P.2d 270 (1970) (revocation of acceptance of toys in February untimely when buyer advertised and attempted to sell them during Christmas season); *Wadsworth Plumbing and Heating Co. v. Tollycraft Corp.*, 277 Or. 433, 560 P.2d 1080 (1977) (acceptance of pleasure fishing boat cannot be revoked when buyer utilized boat until time of trial); *Bowen v. Young*, *supra* (revocation inoperative when buyer subsequently moved into mobile home, made repairs and later moved it to a new location).

Examining the record in the instant case, we find numerous actions by appellees that were inconsistent with their prior revocation of acceptance in May of 1974. First, although not conclusive, appellees' continued residence in the home is one factor to be considered in determining whether they intended to abide by their revocation or whether they intended to accept the home despite the defects and despite their earlier revocation claim. We find that other evidence clearly establishes the latter.

For example, appellees vacated their home in June of 1975,[12] not as a result of a repossession by appellant based upon appellees' revocation of acceptance, but as a result of appellant's eviction of appellees from the mobile home park as a consequence of appellees' violation of certain regulations governing the storage of trash at the park. When appellees were notified in March of 1975 that they were being evicted as a result of the infraction, they attempted to foreclose eviction by making advance rental payments. Moreover, in its March 1975 letter of eviction, appellant was apparently proceeding under the assumption that appellees were not abiding by their prior revocation and stated that appellees were free to remove the mobile home from the park contingent upon procuring the proper hauling permits. Thereafter, appellees vacated the home in June 1975, but continued to make payments to appellant until February 1976 at which time they made plans to remove the home from appellant's park. However, appellees discovered at that time that neither appellant nor the financing bank held the certificate of title to the home and thus appellees were

12. In focusing upon May 29, 1974, as the date when appellees revoked acceptance and the June 1975 date as the time when they vacated the home, we note an anomaly in our obligation on this appeal to review the evidence in the light most favorable to appellees. *See, e. g., Szumski v. Lehman Homes, Inc.*, 267 Pa.Super. 478, 406 A.2d 1142 (1979); *Kiely v. Southeastern Pennsylvania Transp. Auth.*, 264 Pa.Super. 578, 401 A.2d 366 (1979). For purposes of the final issue, as to whether appellees' acts subsequent to revocation constituted a reacceptance, it may be more favorable, for appellees' purposes, to determine that revocation did not actually occur until March of 1975, *see* n. 9, *supra*, and that they did not vacate the home until it was repossessed in October 1976, *see* n. 1, *supra*. Unfortunately, we are not privy to the thought process of the jurors and cannot determine when they concluded that these two events took place. Nevertheless, assuming *arguendo* that revocation took place in March of 1975 and that appellees continued to reside in the home until the time of repossession in October 1976 as a reasonable means of protecting their security interest, we would not be disposed to reach a different conclusion on the final issue. The crucial determinations are that appellees continued to make payments on the home subsequent to revocation and terminated the payments, not as a result of the continuing defects, but as a result of their inability to remove it from appellant's park. Thus, even assuming the more favorable dates, these two factors would not be appreciably altered.

unable to secure the required moving permits. Because no one had the certificate of title to the number 228 home, their suspicion was aroused that the monthly payments were being wasted, and it was upon that premise, and not on the basis of the defects, that appellees terminated their payments in February 1976.[13] Finally, testimony established that while appellees did not reside in the home after June 1975, they continued to store certain of their possessions there and resisted the repossession by appellant in October 1976.

In light of the above evidence, we conclude that appellees' May 29, 1974 revocation of acceptance does not entitle them to recover. Section 1–203 of the U.C.C. imposes an obligation of good faith upon all parties in the performance of any duty under the Code. Thus, when appellees revoked acceptance in May of 1974, they were under an obligation to act in a manner consistent with that action and had no greater right to retain the mobile home than as security for their earlier payments. When, however, appellees continued to

13. The certificate of title to the home was not available because appellees also refused to sign the application for the certificate on the basis of the alleged defects in the number 228 mobile home.

In his dissenting opinion in footnote 2, (p. 367) Judge Spaeth alleges that terminating payments on the basis of this rationale is consistent with his conclusion that appellees did not intend a reacceptance. I disagree. Admittedly, a buyer's termination of payments, in the abstract, would appear inconsistent with a finding of reacceptance. In the instant case, however, appellees' initial revocation was based upon the defects in the home. Despite that revocation, their subsequent actions evidence an intent to retain the home despite the defects including, inter alia, the continued payments and the making of plans to move the home to a new location. Only upon discovering that appellant did not have the certificate of title did appellees rely upon that new development, rather than the alleged defects, to discontinue payments. To me, this indicates that they did not discontinue the payments due to the defects, and perhaps would have moved the home and continued to make the payments if the certificate had been in existence. Thus, the act of discontinuing payments, when tempered with the cited rationale and viewed in the context of appellees' other actions, is consistent with the reacceptance conclusion. The dissent's assertion to the contrary is, I submit, unduly myopic and is limited to the act itself, and fails to fully consider the underlying rationale or the context in which the action occurred.

live in the home and continued to make their monthly payments to appellant, they acted inconsistently with their claimed revocation and lulled appellant into a false belief that appellees would continue to retain and accept the home. Most importantly, appellees, by their continued payments, served only to increase the size of their "security interest" and ultimate judgment, and precluded appellant from taking action to protect its interest in the home.[14] Thus, we believe that appellees failed to display the requisite good faith required in a commercial transaction and by these actions clearly indicated that they would continue to accept the mobile home despite their earlier revocation. As such, appellees' second theory is not supported and judgment non obstante veredicto should have been entered for appellant.

14. In *Marks v. Lehigh Brickface, Inc.*, 19 D&C2d 666 (C.P.Dauph. 1959), the buyers continued to make payments on the outstanding contract even after notice of "rescission" was made to the seller on the advice of counsel and to prevent execution on a judgment obtained by a bank to which the seller had discounted the note and which presumably was a holder in due course. Under those circumstances, the trial court held the continued payments did not preclude the buyers from relying upon their rescission.

We find this case to be distinguished from the instant proceeding in several respects. First, there was no testimony as to why appellees continued to make the payments on the home or whether they were instructed to do so by counsel, and the assertion in the dissenting opinion to the contrary is erroneous. Second, appellees terminated the payments only upon learning that neither appellant nor the financing bank had the certificate of title to the number 228 home. Finally, unlike the buyers in *Marks*, appellees were not faced with imminent repossession by a holder in due course thus mandating continued payments. Rather, under the financing agreement between appellant and the bank, appellant warranted the enforceability of all mobile home financing contracts. Indeed, immediately prior to repossession, the bank charged–off to appellant's reserve account the outstanding payments due under appellees' contract, and it was appellant and not the bank that actually repossessed the home. It is for this reason that the bank was not named as a defendant in this case. Therefore, this was not a situation like *Marks* in which the buyer continued to make payments to prevent repossession by a holder in due course against whom the defects could not have been asserted as a defense. Judge Spaeth's statements to this effect in his dissenting opinion are neither supported by the record nor proper legal analysis.

■ Because we have decided that the trial court erred in dismissing appellant's motion for judgment n. o. v., we next determine the ultimate disposition of this appeal. In particular, we must decide whether to reverse and remand for a complete new trial or to decree judgment n. o. v. for appellant and remand for a new trial limited solely to the issue of damages. In *Denby v. North Side Carpet Cleaning Co.*, 257 Pa.Super. 73, 85, 390 A.2d 252, 258 (1978), *quoting Gagliano v. Ditzler*, 437 Pa. 230, 233, 263 A.2d 319, 320 (1970), we summarized the applicable rule regarding a limited re–trial as follows:

> "A new trial limited to the issue of damages is appropriate 'only where (1) the question of liability is not intertwined with the question of damages, *and* (2) the issue of liability is either (a) not contested or (b) has been fairly determined so that no substantial complaint can be made with respect thereto.' " (Emphasis in original).

*See Stathas v. Wade Estate*, 251 Pa.Super. 269, 380 A.2d 482 (1977).

In applying this test, we find no indication in the instant case that the liability and damage issues are in any way inextricably intertwined. *See Lininger v. Kromer*, 238 Pa. Super. 259, 358 A.2d 89 (1976). The jury apparently resolved the liability issue in favor of appellees and awarded the full amount of $6,404.98 that they had paid to appellant over the approximately four years of the transaction and denied appellant's claim for recovery of the outstanding balance on the installment purchase contract. Thus, the award was not a compromise of the liability and damage issues. Next, we must determine the status of the liability issue under the above test.

The criteria that liability be fairly determined excluding any substantial objections would be satisfied in a case in which the liability issue is clearly established by the jury and not seriously contested by the defendant, thus leaving the adequacy of the damages as the only basis for reversal. *See, e. g., Sternberg v. Dixon*, 411 Pa. 543, 192 A.2d 359 (1963); *Gary v. Mankamyer*, 253 Pa.Super. 306, 384 A.2d 1357 (1978);

*Stathas v. Wade Estate, supra.* It would be inappropriate, however, to reach a similar conclusion in a case like the present in which liability was vigorously contested by both parties and in which an appellate court reverses a jury verdict upon the conclusion that the trial judge erred in refusing to enter judgment n. o. v. In such a case, the question of liability has not been fully determined and the new trial should not be restricted solely to the issue of damages, but should be conducted anew. Thus, although appellant's contention on appeal is that the court erred in refusing to enter judgment n. o. v. based upon appellees' failure to support either theory of recovery, we may remand on that basis for a new trial. *See* 9 Std.Pa.Prac. 563–64 (1962).

Accordingly, judgment in the trial court is reversed and a new trial ordered.

SPAETH, J., files a dissenting opinion.

SPAETH, Judge, dissenting:

I agree with Judge PRICE that appellees timely and properly revoked their initial acceptance of mobile home No. 228 as a substitute for home No. 230; however, I do not agree that appellees reaccepted the home.

According to the Uniform Commercial Code, a buyer may be deemed to have accepted goods, even after an initial rejection or revocation of a prior acceptance, by any of the following actions:

Acceptance of goods occurs when the buyer

(a) after a reasonable opportunity to inspect the goods signifies to the seller that the goods are conforming or that he will take or retain them in spite of their nonconformity; or

(b) fails to make an effective rejection (subsection (1) of Section 2–602), but such acceptance does not occur until the buyer has had a reasonable opportunity to inspect them; or

*(c) does any act inconsistent with the seller's ownership but if such act is wrongful as against the seller it is an acceptance only if ratified by him.*

12A P.S. § 2–606(1), Act of April 6, 1953, P.L. 3, § 2–606, eff. July 1, 1954. Reenacted October 2, 1959, P.L. 1023, § 2, eff. January 1, 1960 (emphasis added).[1]

Judge PRICE finds "numerous actions by appellees that were inconsistent with their prior revocation of acceptance in May of 1974." (At 364) He then identifies these actions: 1) appellees' continued residence in the home even after revocation, and their use of the home for storage after they vacated it in June 1975; 2) appellees' making advanced rental payments to appellant for use of their home site after notice that appellant was terminating their lease; and 3) appellees' continued monthly payments to appellant on the home even after vacating, and their final decision to terminate payments after learning that appellants did not have title to the home. (At 364–365) None of these actions, however, was inconsistent with appellees' revocation of their acceptance.[2]

In *Keen v. Modern Trailer Sales*, 40 Colo.App. 527, 578 P.2d 668 (1978), the Court of Appeals of Colorado, acknowledging settled authority, held that a mobile home buyer's continued residence in a home does not render his revocation of a prior acceptance of the home ineffective. In reversing a judgment denying the buyer's claim for rescission of a contract to buy the home, the court stated:

1. This section appears unchanged in the Act now replacing it; Act of Nov. 1, 1979, P.L. 255, Act No. 86 § 1, effective January 1, 1980; 13 Pa.C.S.A. § 2606(a)(1).

2. Indeed, Judge PRICE seems implicitly to concede as much. Thus he says: "Because no one had the title to the number 228 home, their [appellees'] suspicion was aroused that the monthly payments were being wasted, *and it was upon that premise, and not on the basis of the defects,* that appellees terminated their payments in February 1976." (At 365, emphasis added). Given this statement, with which I agree, I do not understand how the judge finds a reacceptance. If appellees acted because "no one had the title," their action did not manifest a reacceptance.

Numerous cases recognize that a purchaser's occupancy of a mobile home during the pendency of his suit for rescission does not affect the legitimacy of an attempted revocation of acceptance. *E. g. Stroh v. American Recreation & Mobile Home Corp.*, 35 Colo.App. 196, 530 P.2d 989 (1975); *Mobile Home Sales Management, Inc. v. Brown*, 115 Ariz. 11, 562 P.2d 1378 (1977); *Jorgensen v. Pressnall*, 274 Or. 285, 545 P.2d 1382 (1976); *Minsel v. El Rancho Mobile Home Center, Inc.*, 32 Mich.App. 10, 188 N.W.2d 9 (1971).

Indeed, since the timeliness of plaintiff's notice of revocation is not contested, the trial court's use of this factor to determine whether plaintiff's revocation was justifiable places the cart before the horse. For, if a revocation is justifiable, the Code vests the buyer with a security interest in the subject goods, *Irrigation v. Motor & Pump Co. v. Belcher*, 29 Colo.App. 343, 483 P.2d 980 (1971) . . . and such an interest authorizes continued possession to preserve the collateral . . . subject to the seller's right to an offset for the rental value of the possessed goods. *Stroh v. American Recreation, supra; Jorgensen v. Pressnall, supra.*

40 Colo.App. at 530, 578 P.2d at 670.[3]

In *Jorgensen v. Pressnall,* one of the decisions cited by the Colorado court, the Supreme Court of Oregon affirmed a judgment in favor of mobile home buyers who revoked acceptance of their home in December 1972 but stayed in the home until November 1973. There the court said:

. . . plaintiffs retained a security interest in the mobile home after the revocation of acceptance. This entitled them to continue in possession to preserve their collateral.

**3.** The security interest of the buyer is based on Section 2–711(3) of the U.C.C., which provides

On rightful rejection or justifiable revocation of acceptance *a buyer has a security interest in goods in his possession* or control for any payments made on their price and any expenses reasonably incurred in their inspection, receipt, transportation, care, and custody *and may hold such goods* and resell them in like manner as an aggrieved seller . . . .

12A P.S. § 2–711(3) (emphasis added).

Continued occupancy was the most feasible method of protecting the mobile home from water damage. The alternative was to find covered storage which would have been expensive.

274 Or. at 292, 545 P.2d at 1385–86.

Thus, appellees' continued residence in the home, and their use of it for storage, after their revocation of their acceptance did not constitute a reacceptance of the home. Similarly, neither did appellees' continued monthly payments on the home constitute a reacceptance. The purpose of these payments was only to avoid loss of the home in repossession proceedings by the bank with which appellees had financed its purchase. And the same may be said regarding appellees' advance rental payments. Appellees made the payments only after receiving a letter from appellant terminating the oral month–to–month lease for the home site. It is clear that by making the payments in response to this letter, appellees did not reaccept the home but only acted to protect their interest in the homesite by keeping the home at its original location pending resolution of their disputes with appellant. After appellant refused to accept advanced rental, appellees tried to remove the home from appellant's park. In so doing, they discovered that neither appellant nor the financing bank, Valley Trust Company, held title to the home. A certificate of title was required for a moving permit. Unable to obtain legal title to the home, appellees finally terminated payments to appellant in February 1976. They continued to use the home for storage until October 1976, when appellant took repossession of it.

Judge PRICE also states that appellees by their conduct "lulled appellant into a false belief that appellees would continue to retain and accept the home." (At 366). I am unable to find any support for this statement in the record. Instead, the evidence supports the lower court's observation that:

It was almost undisputed that the first home given to the plaintiffs was not the home they were shown by the defendant's salesman. From the very beginning, the

plaintiffs made frequent requests that they be given the home shown to them and or to have the defendant repair the defects in the home or homes they were given. The testimony discloses that a period of five (5) years went by with the plaintiffs constantly in contact with the defendant requesting that the non–conformity be cured.

(Slip op. of lower court at 3)

Neither am I able to find any support for Judge PRICE's statement that appellees "failed to display the requisite good faith." (At 366.). Again, the record supports an opposite conclusion–that appellees were doing all they could to protect the home and their security interest in the home, all with the hope that their disputes with appellant would be resolved. Consider, for example, the following testimony by appellee William Cardwell:

Q: [Bruce Grove, counsel for appellees]: And, following the hearing in the fall of 1973 [on the criminal charges brought by International Housing against Cardwell] did you continue to reside in this 228 home?

A: Yes, sir.

Q: And on whose advice?

A: Your advice.

Q: And at this point in time what was your understanding as to how the complaints you were trying to get resolved with International Housing would be resolved?

A: Well, I was still on their property and still trying to do the right thing, still trying to get them to fix the trailers up so I could live in them–be halfway decent with that kind of money. They wouldn't do anything.

(R.R. 86a)

Mr. Cardwell further testified that the only reason he eventually terminated payments on the home was that he learned that neither the bank nor appellant had title to the home, and feared that his payments were not protecting his security interest:

Q: [Grove]: Why did you stop paying the bank?

A: Because there was no title to the trailer I had. I figured I done lost enough money in the trailer. I couldn't get nothing done to it, so the only way I could get an action is to let it go.

(R.R. 88a)

In this regard, it should be noted that at least one court has acknowledged that a mobile home buyer who remains with a home after revoking his acceptance of it actually protects the right of the seller as well as himself:

The observation can be made at this point that plaintiffs by living in the home and maintaining it to the best of their ability were also preserving it for the benefit of the seller as well as holding it for their own security. *Mobile Home Sales Management v. Brown*, 115 Ariz. 11, 562 P.2d 1378, 1382 (1977) (footnotes omitted).

It is our obligation to view the evidence in the light most favorable to appellees, and to give appellees the benefit of all reasonable inferences from the evidence. Doing so, I find the evidence sufficient to support the jury's verdict in appellees' favor on the theory that they had accepted the home but revoked their acceptance because of defects in the home. Therefore, I should affirm the order of the lower court.