George **ROBERTS**, Richard Harney,
and H & R Contracting, Inc.,
Plaintiffs–Appellants,

v.

Jenny C.J. **ADAMS**, individually and as Trustee of U/D/T dated 11/23/87 by Jenny C.J. Adams, Donor, Defendant–Appellee.

No. 00CA2288.

Colorado Court of Appeals,
Div. I.

Dec. 20, 2001.

Certiorari Denied May 28, 2002.

Waldbaum, Corn, Koff & Berger, Michael H. Berger, Scot M. Peterson, Denver, CO, for Plaintiffs–Appellants.

Bailey & Peterson, P.C., James S. Bailey, Jr., Randall M. Livingston, Denver, CO, for Defendant–Appellee.

Opinion by Judge TAUBMAN.

Plaintiffs, George Roberts, Richard Harney, and H & R Contracting, Inc. (collectively builders), appeal the judgment entered in favor of defendant, Jenny C.J. Adams. Builders also appeal the trial court's order granting Adams' request for attorney fees. We affirm in part, reverse in part, and remand for additional proceedings.

Builders are home builders in Eagle County. In September 1996, they sold a house they had built (Cordillera property) to Adams and her then husband pursuant to a residential contract to buy and sell real estate. The stated purchase price in the real estate contract was $1,000,000.

At the same time the parties negotiated and signed the real estate contract, Adams signed a promissory note. The promissory note provided that builders would receive, from Adams, an additional $200,000 in consideration for builders' agreement, in the real estate contract, to sell the Cordillera property for a purchase price of $1,000,000.

However, the promissory note included two alternative conditions for builders to receive the $200,000. Condition A stated that Adams would pay builders $200,000 if she were able to settle amicably all outstanding issues related to construction of a home on another parcel (the Alcazar property) for $200,000 or more. It is undisputed that, because Adams received a lump sum payment of only $180,000, condition A was not met. Condition B stated if Adams were unable to receive a lump sum settlement of the Alcazar contract, builders would receive $200,000 following the resale of the Alcazar property.

The Alcazar property was subject to a purchase and sale agreement between Adams and her then husband, on the one hand, and International Village Homes (International), on the other. Adams had deposited approximately $100,000 as earnest money with International. Also, she had invested additional money for extras such as cabinetry. However, International had not completed construction of that house within the time required by the purchase and sale agreement. Accordingly, Adams was seeking a return of her earnest money from International.

After a lengthy period of negotiation with International, in which builders participated to assist Adams, Adams and International agreed in May 1997 that International would pay $180,000 and Adams would convey any interest she had in the Alcazar property, by quitclaim deed, to another entity, which had commenced a foreclosure proceeding against International.

When Adams did not pay builders $200,000 pursuant to the promissory note after she settled with International, builders filed this action against Adams alleging, among other things, breach of contract. Adams counterclaimed, seeking, among other relief, damages for breach of warranty.

After a two-day trial, the trial court determined that neither condition of the promissory note had been met. Specifically, the trial court determined that condition A had not been met because Adams had received only $180,000 and not at least $200,000 as a result of her settlement with International. It also ruled that condition B had not been met because no resale of the Alcazar property had occurred.

On the counterclaims, the trial court awarded Adams $2,610 in damages—$110 for payments Adams made to a landscaping company for sod, and $2,500 for carpet replacement. In addition, the trial court awarded Adams $62,563 in attorney fees. The trial

court determined that Adams, as the prevailing party, was entitled to attorney fees under a provision in the real estate contract.

## I. Breach of Contract

Builders contend the trial court erred when it found that condition B on the promissory note had not been met. Specifically, builders argue that condition B was fulfilled by the resale of the Alcazar property to the other entity. We disagree.

■ The interpretation of language in a contract is a question of law that an appellate court reviews de novo. *Ad Two, Inc. v. City & County of Denver,* 9 P.3d 373 (Colo.2000).

■ The court's duty is to interpret and enforce contracts as written, not to rewrite or restructure them. *Fox v. I–10, Ltd.,* 957 P.2d 1018 (Colo.1998).

■ To determine the meaning of a contract, courts are guided by the general rules of contract construction and should seek to give effect to all provisions so that none will be rendered meaningless. *Pub. Serv. Co. v. Wallis & Cos.,* 986 P.2d 924 (Colo.1999).

■ Further, a court should strive to ascertain and give effect to the mutual intent of the parties. An integrated contract in the first instance is to be interpreted in its entirety to harmonize all its provisions. In the absence of contrary manifestation of intent in the contract itself, contractual terms that have a generally prevailing meaning will be interpreted according to that meaning. *Pepcol Mfg. Co. v. Denver Union Corp.,* 687 P.2d 1310 (Colo.1984).

■ Here, builders rely on the doctrine of equitable conversion to support their claim that condition B was met. They assert that Adams' transfer of her interest in the Alcazar property to the other entity established that she purchased the property and then resold it. Builders argue that a resale occurred, as a matter of law, because Adams held equitable title to the Alcazar Property, which she conveyed through a quitclaim deed. We are not persuaded for several reasons.

### A.

First, condition B was triggered by the resale of the Alcazar property. However, if there was no sale of such property, there could be no resale.

Here, International never sold the Alcazar property to Adams. While the Alcazar purchase and sale agreement contemplated a sale, it was subject to certain terms and conditions. One of these conditions was that International would substantially complete construction of the property within eighteen months from the date the contract was executed. If either party failed to perform under the purchase and sale agreement, the contract specified remedies for each party. One of Adams' remedies was to terminate the agreement and demand return of her earnest money with interest.

The record demonstrates that the purchase and sale agreement was abrogated by the parties, or, at a minimum, that an impasse was reached between the parties. Adams never closed on the purchase of the property because of construction problems, disputes over pricing, and International's failure to meet the construction deadline. The settlement agreement was the result of Adams' negotiations with International to recoup her earnest money and other investments in the property. Because the terms of the purchase and sale agreement were never fulfilled, there was never a purchase by Adams or a sale by International; therefore, the transfer of Adams' interest in the property by a quitclaim deed was not a resale. *See Regional Transp. Dist. v. Martin Marietta Corp.,* 805 P.2d 1102, 1106 (Colo.1991)(Erickson, J., dissenting)(resale occurs when the purchaser of property sells that property to a second purchaser).

### B.

Second, although condition B was predicated on a resale of the Alcazar property, the agreement between Adams and International was termed a settlement agreement, which is consistent with the language in condition A. Indeed, builders and Adams consistently referred to "the settlement," "the settlement agreement," and "the settlement negotia-

tions"; they never referred to it as a sale or a resale.

### C.

■ Third, we reject builders' contention that the doctrine of equitable conversion applies under these circumstances. Under this doctrine, a contract for the sale and purchase of real property converts a seller's interest in real property to a right to receive payment under a contract, and the purchaser's interest into realty. *Konecny v. von Gunten,* 151 Colo. 376, 379 P.2d 158 (1963). Moreover, the purchaser obtains an equitable right to maintain a quiet title action and divests the seller of the power to reconvey title. *First Nat'l Bank v. McGinnis,* 819 P.2d 1080 (Colo.App.1991).

■ However, this doctrine of equitable conversion is applicable only when there is a specifically enforceable contract between the parties, and the changes in the rights, duties, powers, and liabilities of the parties that result from the making of the contract are consequences of the equitable right to specific performance. *People v. Alexander,* 663 P.2d 1024, 1030 n. 6 (Colo.1983)(quoting III *American Law of Property* § 11.22, at 62–63 (A. Casner ed.1974)); *see also Dwyer v. District Court,* 188 Colo. 41, 532 P.2d 725 (1975)(quoting the Supreme Court of Appeals of Virginia in *Carmichael v. Snyder,* 209 Va. 451, 164 S.E.2d 703 (1968), and stating plaintiffs had an equitable estate or interest in the land and could have forced specific performance).

■ Builders argue that Adams sold the property, and thus a resale occurred, because she transferred equitable title to the third party. Builders contend that equitable principles require us to treat the settlement and conveyance of a quitclaim deed as a resale. We decline to do so.

Here, although Adams conveyed whatever interest, if any, she had in the Alcazar property to a third party through a quitclaim deed, she had no right under the purchase and sale agreement to specific performance on the contract. Indeed, the contract explicitly prohibits specific performance. Accordingly, International was not divested of equi-

table title in the property because Adams lacked the right to force a sale of the property and require International to transfer title to her. *See People v. Alexander, supra.*

In addition, Adams' execution of a quitclaim deed does not necessarily indicate that she had any interest in the property to convey. *See Tuttle v. Burrows,* 852 P.2d 1314 (Colo.App.1992)(a quitclaim deed does not represent that a grantor possesses any interest in land).

Thus, we conclude that Adams did not have equitable title in the property and could not take advantage of the doctrine of equitable conversion.

### D.

Fourth, although the conditions of the promissory note were "bizarre," as the trial court concluded, because builders could receive nothing if Adams settled with International for $199,999, we conclude that it is plausible under these circumstances that the parties would draft such an agreement.

The course of negotiations between builders and Adams reflected that both parties understood the real estate contract and the promissory note were two interdependent documents that resolved matters of importance to both parties. The final real estate contract and promissory note were the result of lengthy negotiations between the parties focused primarily on the price of the property. The sum of $200,000 was included in the promissory note because builders wanted to sell the Cordillera property for $1,200,000. However, Adams' then husband would only agree to that price if the issues surrounding the Alcazar property were resolved in a way that met the Adamses' needs. The final signed real estate contract was the third iteration of the document, with different prices reflected in each previous draft. The promissory note was drafted only after Adams' then husband refused to sign the second real estate agreement unless contingent terms dealing with the settlement of the Alcazar property were included.

Indeed, the record reveals that plaintiff Roberts was integrally involved in the negotiations, knew of the dispute between Adams

and International and the Adamses' desire to resolve the disputes surrounding the Alcazar property, and even acted on Adams' behalf in an effort to negotiate a settlement with International. Additionally, builders benefited from the unconventional contract because it allowed them to use Adams' earnest money payment of $200,000 immediately to pay off debtors, instead of placing the money in escrow until closing.

### E.

Fifth, the record supports the trial court's conclusion that Roberts did not read the promissory note carefully, and his partner, Harney, did not read the note at all before signing it.

■ A party may not be relieved of its obligation under a contract simply because it struck a bad bargain. *See Corp. Fin. Associates Paducah, Inc. v. Rathbone*, 680 P.2d 859 (Colo.App.1984). By signing the contract, builders are presumed to know its terms and should be bound by them. *See Cordillera Corp. v. Heard*, 41 Colo.App. 537, 592 P.2d 12 (1978), *aff'd*, 200 Colo. 72, 612 P.2d 92 (1980).

### F.

Under builders' proposed reading of the promissory note, condition B would be triggered if Adams received a lump sum payment from International regardless of the amount she received, as long as she transferred any interest she had in the Alcazar property to a third party through a quitclaim deed. This reading of condition B would render condition A meaningless. In other words, if we accept builders' interpretation of the provisions, condition B would always be triggered, no matter how much Adams received in settlement, and there would be no need for condition A.

Therefore, even if we were to conclude that Adams held equitable title, we decline to interpret condition B in such a way that Adams' transfer of her interests constituted a resale, because such interpretation would render condition A superfluous. *See Pub. Serv. Co. v. Wallis & Cos., supra.*

### G.

Finally, based on the evidence presented at trial, the trial court determined that the terms of the promissory note were not ambiguous. Although builders maintained during oral argument that any ambiguity in the promissory note should be construed against Adams, who drafted it, we agree with the trial court that the terms were not ambiguous.

■ Terms used in a contract are ambiguous when they are susceptible of more than one reasonable interpretation. Absent such ambiguity, we will not look beyond the four corners of the agreement to determine the meaning intended by the parties. The mere fact that the parties may have different opinions regarding the interpretation of the contract does not itself create an ambiguity in the contract. *Ad Two, Inc. v. City & County of Denver, supra.*

The generally accepted meaning of the term "resale" contemplates that there first be a sale. This term is not ambiguous. Additionally, before concluding the word was not ambiguous, the trial court heard evidence that builders and Adams both believed that condition B would apply if the Alcazar property were purchased by Adams, construction completed by builders or another contractor, and the property subsequently sold by Adams. This scenario supports the trial court's determination that a resale in those circumstances would have satisfied condition B, would have allowed Adams to participate in the value of the Alcazar property, and would have placed her in a position to pay builders $200,000.

Thus, we conclude that the trial court did not err when it determined that condition B of the promissory note was not met.

## II. Award of Damages

Builders contend the evidence was insufficient to support the trial court's award of damages on Adams' counterclaims. We agree in part.

■ Generally, recovery for damages is allowed once the cause and existence of damages have been established, even though the

exact amount of damages may be uncertain or impossible to determine. *Graphic Directions, Inc. v. Bush,* 862 P.2d 1020 (Colo. App.1993). However, damages based on mere speculation and conjecture are not allowed. *Sonoco Prods. Co. v. Johnson,* 23 P.3d 1287 (Colo.App.2001).

One claiming damages must submit "substantial evidence, which together with reasonable inferences to be drawn therefrom provides a reasonable basis for computation of the damage." *Pomeranz v. McDonald's Corp.,* 843 P.2d 1378, 1383 (Colo.1993).

Substantial evidence is that which is probative, credible, and competent. It is evidence of a character that would warrant a reasonable belief in the existence of facts supporting a particular finding, without regard to the existence of contradicting testimony or contradictory inferences. *Graphic Directions, Inc. v. Bush, supra.*

Accordingly, if there is no competent evidence to support a damage award, it is clearly erroneous. *Sonoco Prods. Co. v. Johnson, supra.*

The trial court has the sole prerogative to assess the amount of damages, and its award will not be set aside unless it is manifestly and clearly erroneous. Under the circumstances of each case, the trial court has the responsibility to make a reasonable finding that would provide for a fair, equitable, and adequate award of damages. *Sonoco Prods. Co. v. Johnson, supra.*

Although the evidence is somewhat conflicting, Adams testified that she paid the landscaping company $2,610 for sod, but was only reimbursed $2,500 by builders, and is thereby entitled to $110 in damages.

However, based on our review of the record, we conclude that Adams did not present evidence from which the trial court could compute her damages related to her carpet replacement claim.

Initially, Adams had claimed damages of $18,980 for the replacement of carpeting that builders would not cover under warranty. Adams' testimony reveals that the carpeting was wearing severely on the stairway and had buckled in the master bedroom. She stated that the cost of replacing the carpet throughout the house was $13,418.12, and that she replaced the carpet on the stairs with a metal treatment that cost approximately $4,500. Yet, Adams presented no evidence of the cost to replace carpet only on the stairs or in the master bedroom. For example, she included no measurements of the master bedroom or stairs, and she did not present any evidence of the cost of the carpet per square yard. However, although the trial court conceded that it did not have any way to estimate the amount of damages for the carpeting, it assessed damages of $2,500.

We conclude that the evidence Adams presented did not provide a reasonable basis from which the trial court could determine that she suffered $2,500 in damages. Thus, Adams' evidence was insufficient, as a matter of law, to establish damages; consequently, the damages award for carpeting on the stairs and in the master bedroom cannot stand.

Therefore, we affirm the trial court's determination of $110 in damages for landscaping expense and reverse the trial court's award of damages for the carpet.

### III. Attorney Fees

Builders make three arguments that the trial court erred when it granted Adams' request for attorney fees: (1) there was no basis for an award of attorney fees; (2) Adams waived any claim she might have for attorney fees; and (3) the trial court erred by awarding attorney fees without holding a hearing. We disagree with the first two contentions, but agree with the third.

### A. Basis for Award of Attorney Fees

We reject builders' contention that there was no contractual or statutory basis under which the trial court could award attorney fees.

In the absence of a statute, court rule, or private contract to the contrary, attorney fees are not recoverable by a prevailing party in either a contract or a tort action.

*Agritrack, Inc. v. DeJohn Housemoving, Inc.,* 25 P.3d 1187 (Colo.2001).

Here, because no statute or rule provides for the award of attorney fees, the contracts between the parties are the only possible basis for such an award. We focus, therefore, on paragraph 16(B) in the real estate contract, which provides in pertinent part, "In the event of any litigation or arbitration *arising out of* this contract, the court shall award the prevailing party all reasonable costs and expenses, including attorney fees" (emphasis added).

■ The trial court determined that builders' claims arose under the real estate contract. Builders argue that their claims cannot be characterized as arising out of the real estate contract because their complaint only sought to collect money owed under the promissory note, which does not contain an attorney fees provision and is an entirely independent document. We are not persuaded.

The language "arising out of" has not been interpreted in a breach of contract case in Colorado. However, in tort actions for bodily injury or property damage, the supreme court has said the language "arising out of" means to "originate from," "grow out of," or "flow from." *City & County of Denver v. Gonzales,* 17 P.3d 137, 141 (Colo.2001)(interpreting language in an automobile insurance policy). We see no reason why this definition should not apply to the same language in an attorney fees provision in a real estate contract.

Here, the record shows that builders' claims arose under the real estate contract. Throughout the litigation, builders argued that Adams had agreed to a purchase price of $1,200,000 for the Cordillera property. Builders characterized the transaction between the parties as one real estate transaction bifurcated into two payment agreements—$1,000,000 specified in the real estate contract and $200,000 specified in the promissory note. The promissory note itself states that Adams agreed to pay builders an additional $200,000, if certain conditions were met, in consideration for builders' agreement to sell the Cordillera property to Adams for $1,000,000 in the real estate contract. Addi-

tionally, the promissory note states that it is contingent upon Adams' purchase of the Cordillera property as set forth in the real estate contract.

Moreover, the promissory note involves the same transaction and subject matter as the real estate contract, and the parties signed the note contemporaneously with the real estate contract. Finally, the promissory note exists only as a result of the payment terms outlined in the real estate contract. Accordingly, we conclude that builders' claims originated or flowed from the real estate contract.

We are not persuaded by builders' reliance on *Burt v. Craig,* 146 Colo. 173, 360 P.2d 976 (1961), to reach a different conclusion. In *Burt,* the supreme court affirmed the trial court's denial of the plaintiffs' request for attorney fees under a promissory note when the plaintiffs brought an action for declaratory judgment under a separate contract. The promissory note provided for payment of attorney fees in the event that counsel was employed to enforce it. Although the contract referred to the terms of the promissory note, the *Burt* court stated that the plaintiffs "elected to forego action on the note and chose to proceed under the default and surrender terms of the contract." *Burt v. Craig, supra,* 146 Colo. at 178, 360 P.2d at 979. The court found that the note and mortgage were only remotely connected to an action for declaratory judgment based on a contract.

Thus, relying on *Burt,* builders maintain that a trial court may not incorporate into one document an attorney fees provision from an independent document. We disagree for two reasons. First, the *Burt* court did not address whether the attorney fees provision of the promissory note contained any "arising out of" language. Second, in *Burt,* attorney fees were expressly available under the promissory note if counsel were employed to enforce the note. The *Burt* plaintiffs brought their action under a separate recovery provision in the contract, not under the promissory note. Therefore, we conclude that *Burt* is distinguishable, and that the trial court did not err when it deter-

mined that Adams, as the prevailing party, was entitled to attorney fees under the real estate contract.

### B.  Waived Attorney Fees

■ Builders next argue that Adams waived any claim to attorney fees by failing to include the claim in the trial management order.  We disagree.

Concerning the trial management order, C.R.C.P. 16(c)(1)(V) provides: "Each claiming party shall set forth a detailed and itemized calculation of damages or description of relief sought and the basis therefor."

■ Attorney fees are neither costs nor damages, but a hybrid, of each.  *Ferrell v. Glenwood Brokers, Ltd.,* 848 P.2d 936 (Colo. 1993).

■ Whether an award of attorney fees is authorized by statute or by contract, if the award is dependent upon success in the litigation in which the fees are to be awarded and the fees are for services rendered in connection with that litigation, a determination of the propriety of an award of fees need not be made until that litigation is completed and the result is known.  Indeed, until the litigation is completed, it may be impracticable to calculate the proper amount of fees to be awarded, either because the extent of the remaining services to be rendered cannot be ascertained or because the result achieved may itself affect the proper amount of fees to be awarded.  *Roa v. Miller,* 784 P.2d 826, 830 (Colo.App.1989).

■ Furthermore, if attorney fees are simply the consequence of a contractual agreement to shift fees to a prevailing party, they are to be treated as costs and not damages, at least where the fee-shifting contract provision is not the subject of the dispute between the parties and the contract itself is proven to exist.  It is within the sound discretion of the trial court to defer consideration of the claim for fees, and the amount of such fees, until after the merits of the case are decided.  *Chartier v. Weinland Homes, Inc.,* 25 P.3d 1279 (Colo.App.2001).

Here, although Adams did not raise the issue of attorney fees in the trial manage-ment order, she did request attorney fees and costs in her counterclaim.  Therefore, builders had notice that attorney fees were an issue.  In addition, the trial court could properly address this issue after trial, whether or not Adams had previously sought to reserve that issue.  *See Roa v. Miller, supra* (a successful plaintiff claiming attorney fees under a provision in a promissory note was not required to present evidence of such fees at trial).

Therefore, we conclude that Adams did not waive her claim to attorney fees by failing to include the claim in the trial management order.

### C.  Hearing on Attorney Fees

■ Builders also contend that the trial court abused its discretion in awarding Adams $62,563 in attorney fees without holding an evidentiary hearing on the issue.  We agree.

Relying on *In re Marriage of Aldrich,* 945 P.2d 1370 (Colo.1997), and *Pedlow v. Stamp,* 776 P.2d 382 (Colo.1989), builders argue that a party that makes a timely request for a hearing is entitled to a hearing.  However, Adams argues that based on the language of C.R.C.P. 121 § 1–22, the trial court acted within its discretion in electing to forgo a hearing.  We agree with builders.

C.R.C.P. 121 § 1–22(2)(c) provides, in relevant part:

Any party which may be affected by the motion for attorney fees may request a hearing within the time permitted to file a reply. . . .  When required to do so by law, the court shall grant a party's timely request for a hearing.  In other cases where a party has made a timely request for a hearing, the court shall hold a hearing if it determines in its discretion that a hearing would materially assist the court in ruling on the motion.

In *Aldrich* and *Pedlow,* the supreme court did not consider whether a hearing was required, when requested, under C.R.C.P. 121 § 1–22.  Nevertheless, the supreme court held that a party requesting a hearing on its request for attorney fees under §§ 13–17–102 and 14–10–119, C.R.S.2001, was entitled

to one. The supreme court reached this conclusion even though neither statute included any provision for a hearing.

 When a hearing is requested to determine the reasonableness and necessity of attorney fees, due process requires that the trial court hold such a hearing. *In re Marriage of Mockelmann*, 944 P.2d 670 (Colo. App.1997) (requiring a hearing under § 14–10–119).

 Furthermore, because the reasonableness of the amount of attorney fees requested by a party is not verifiable by reference to any statute or other fixed standard, if the reasonableness of such fees is challenged, the challenging party is entitled to a hearing, if it requests one. *See In re Marriage of Mockelmann, supra; Dunlap v. Long*, 902 P.2d 446 (Colo.App.1995)(where reasonableness of expert fees is challenged, and a hearing requested, challenging party is entitled to a hearing on issue notwithstanding language in C.R.C.P. 121 § 1–15(4) stating court may order a hearing at its discretion).

Here, in response to Adams' motion for fees and costs, builders specifically requested a hearing on the reasonableness of the fees and submitted an affidavit from a Colorado lawyer stating that such fees were unreasonable. Although the trial court made findings as to the reasonableness of the requested attorney fees, disputed issues of fact still remained.

We conclude these issues should have been resolved after a hearing at which the parties' witnesses would be subject to cross-examination. Thus, we hold that, notwithstanding the discretionary language in C.R.C.P. 121 § 1–22(2)(c), a party is entitled to an evidentiary hearing to determine a reasonable amount of attorney fees at least when, as here, it presents the affidavit of an expert on attorney fees raising disputed issues of fact and a significant amount of fees has been requested.

Accordingly, we conclude that builders were entitled to an evidentiary hearing on the reasonableness of Adams' claim for attorney fees. Therefore, we reverse the trial court's award of attorney fees and remand for an evidentiary hearing and a determination of a reasonable amount of attorney fees.

The judgment is affirmed except as to the award of money damages for the carpet, which is reversed. The order determining Adams' entitlement to attorney fees is affirmed, except as to the amount of attorney fees, which is reversed, and the case is remanded for additional proceedings, including an evidentiary hearing, consistent with this opinion.

METZGER and NEY, JJ., concur.