**RANTA CONSTRUCTION, INC.,**
**Plaintiff–Appellee,**

v.

**Scott and Maggie ANDERSON,**
**Defendants–Appellants,**

and

**Telluride Window & Doors, Third–**
**Party Defendant–Appellee.**

No. 07CA0032.

Colorado Court of Appeals,
Div. IV.

June 26, 2008.

**838**

Coleman, Williams & Jouflas, Joseph Coleman, Grand Junction, Colorado; McLachlan, Whitley & Underell, LLC, Marla C. Underell, Durango, Colorado, for Plaintiff–Appellee.

Otten, Johnson, Robinson, Neff & Ragonetti, P.C., Darrell G. Waas, David P. Hutchinson, Michael Francisco, Denver, Colorado, for Defendants–Appellants.

Fisher, Sweetbaum, Levin & Sands, P.C., Jon F. Sands, Chelsey M. Burns, Denver, Colorado, for Third–Party Defendant–Appellee.

Opinion by Judge ROY.

Scott and Maggie Anderson (the owners) appeal the trial court's decree of foreclosure and judgment in favor of Ranta Construction, Inc. (the contractor), and the trial court's judgment and award of attorney fees to Telluride Window & Doors (the vendor). We affirm, and remand the case for further proceedings.

The owners and the contractor signed an agreement to build a custom home in Telluride, Colorado. The contract price was approximately $1,500,000. The owners elected to manage the construction contract in lieu of the architect. They selected custom windows manufactured by Heritage Woodwork Company (the manufacturer), purchased them from or through the vendor, and paid the vendor directly. No defects were observed by the contractor or an owner who was present upon delivery. However, shortly after installation, defects began appearing including bowing, breaking, and leaking.

After an extended investigation, the defects were determined to be the result of defective glass and the sealing system. However, before the contractor and vendor could complete repairs, one of the owners, apparently frustrated by the delay and apparent lack of an acceptable manufacturer's express written warranty, and distrustful of the field repair proposed by the manufacturer, the vendor, and the contractor, sprayed the windows with water, which made the scheduled repairs impossible. Shortly thereafter, the owners barred the vendor and the contractor from the property and withheld all progress payments due to the contractor.

Subsequent settlement negotiations failed when the parties could not agree on whether the owners should immediately release the progress payments or extend the contract time. After the owners discharged their counsel, the contractor informed them it was initiating foreclosure on its previously recorded mechanic's lien. The owners then terminated the construction contract and asserted counterclaims against the contractor including breach of contract, breach of warranties, and excessive lien. They also asserted third-party claims against the vendor, the manufacturer, the glass manufacturer, and a purported window distributor, including negligent misrepresentation; violations of the

Colorado Consumer Protection Act (CCPA), §§ 6–1–101, –115, C.R.S.2007; negligent design, manufacture, and distribution; indemnification; contribution; and negligence.

Prior to trial, the window distributor, which provided information on the windows to the vendor, informed the trial court that it had gone out of business well before the window selection process began and it was dismissed from the suit. In addition, the manufacturer declared bankruptcy prior to trial and discontinued participation in the case.

Following an extended bench trial, the trial court found and concluded that the owners interfered with the contractor's right to repair the windows, wrongfully withheld progress payments, and thereby breached the contract, excusing further performance of the contractor. The trial court also found that the windows were defective and that the vendor was liable to the owners for breach of warranty. The trial court dismissed the remaining claims.

The vendor then moved for a judgment notwithstanding the verdict, arguing that under a breach of warranty claim it had a right to repair the windows with which the owners interfered. The trial court agreed, reversed its judgment against the vendor, and granted it attorney fees and costs pursuant to section 13–17–102, C.R.S.2007. This appeal followed.

## I.

The owners first contend that the trial court erred in concluding that the contractor had a right to repair the defective windows rather than a duty to replace them. We disagree.

■ The owners argue that the trial court erred in ignoring contract terms that required the contractor to detect the defects on delivery, to replace defective windows rather than repair them, and to deliver evidence that the manufacturer would countersign a reinstated and acceptable express warranty if the windows were repaired. They imply that because the contractor failed to fulfill those contract terms, its breach preceded

theirs and excused any subsequent breach on their part.

"In reviewing a breach of contract case, we defer to the trial court's findings of fact if the record supports them, and we review its conclusions of law de novo." *Albright v. McDermond*, 14 P.3d 318, 322 (Colo.2000). "The interpretation of language in a contract is a question of law that an appellate court reviews de novo." *Roberts v. Adams*, 47 P.3d 690, 694 (Colo.App.2001). A court is guided by general rules of contract construction and should give effect to all provisions such that none is rendered meaningless. *Id.*

Here, the contract consists of an agreement drafted by the contractor (the contract), which incorporates the architect's specifications (Specifications), which, in turn, incorporate the standard American Institute of Architects General Conditions (AIA Conditions).

Specification 01600 § 1.5.A.4 requires the contractor to inspect all products delivered to the jobsite to ensure compliance with the contract documents. Specification 01210 § 3.1A requires the contractor to inspect on delivery all allowance items, such as windows, for damage or defects and to return all defective products to the manufacturer for replacement.

Contract § 13.2 requires the contractor to "correct any [w]ork that fails to conform to the requirements of the contract ... where such failure to conform appears during the progress of the [w]ork." AIA Condition 12.2.1.1 requires the contractor to promptly correct, at its own expense, work that fails to conform to the contract documents. AIA Condition 1.1.3 defines "[w]ork" as including "all other labor, materials, equipment and services provided or to be provided by the [c]ontractor to fulfill the [c]ontractor's obligations." Contract § 10.1 also gives the contractor sole responsibility "for all construction means, methods, techniques, sequences and procedures and for coordinating all portions of the [w]ork."

Specification 01740 § 1.1 E also requires the contractor, "[w]hen [w]ork covered by a warranty has failed and been corrected by replacement or rebuilding," to "reinstate the

warranty by written endorsement." Specification 01740 § 1.1 B defines "special warranties" as warranties modified "either to extend time limits provided by the standard warranties or to provide greater rights for the [owners]." Although the warranty for wood windows is entitled "Special Warranty" in Specification 08550 § 1.5A, the text of the provision discusses a standard express warranty for the standard number of years from the date of substantial completion. Where a special warranty is involved, Specification 01740 § 1.1.G.2 reserves to the owners "the right to refuse to accept the [w]ork until the [contractor] presents evidence that entities required to countersign such commitments are willing to do so." In general, however, the contractor is required to deliver all warranties to the owners prior to the final payment, pursuant to Contract § 7.5.

Considering the contract so as to give effect to each provision, we conclude that the contractor is required to inspect all materials on delivery and, if defects are discovered, the contractor must return the goods for replacement. However, if the defect is not discovered until the goods are incorporated into the work, the contractor is required to remedy the defect in a manner that it deems appropriate to meet the contract requirements. At substantial completion, the contractor must then deliver to the owners an express manufacturer's warranty for any corrected work or replaced materials. Further, if the windows require a special warranty, the contractor has until the date of substantial completion to deliver it, bearing the risk of nonconformance which may include replacement of the windows at its expense.

The record supports the following trial court findings. The sample upon which the owners based their window selection included a butyl sealing system between the exterior aluminum cladding and the glass. The contractor and an owner unloaded the windows on delivery and noticed no defects. Unbeknownst to the contractor and the owner, the windows, as delivered, utilized an open-cell foam tape sealing system and defective glass which allowed moisture into the interior portions of the windows and resulted in the bowing or breaking of the glass. These de-fects became apparent only after the windows were installed.

After an investigation and discussion with the manufacturer, the vendor recommended a field solution that called for the replacement of the defective glass and the defective sealing system. The process of identifying the cause, the appropriate field solution, and the acquisition of the necessary materials consumed approximately three months during which other aspects of the project continued.

However, on the eve of the day scheduled to finish repairing the windows, the owners, at a meeting with the contractor, demanded one of three solutions to the window problem: requiring the contractor to repair and warrant the windows itself, replacing the windows with different windows at the contractor's expense, or litigation. The contractor then ordered the vendor to pursue the recommended field solution so as not to void the manufacturer's warranty. However, the owners prevented the repairs by first spraying the windows with water and then barring the contractor and the vendor from the property.

The owners then retained a window consultant who concluded that the windows were defective but could be repaired in place. At trial, the architect testified that the contractor had a right to repair the windows and that the proposed repairs were reasonable.

Adopting the owners' consultant's report, the trial court concluded that the windows were defective as delivered, but that they could have been corrected by the vendor's suggested field repairs. The trial court also concluded that, under the terms of the contract, the contractor had a duty to repair the windows and that, because the owners had prevented the repair, they could not rely on the contractor's failure to repair as a basis for withholding progress payments.

Accordingly, we conclude that the trial court properly determined that the contractor had a contractual right to repair the windows and was not obligated to replace them at the time it was barred from the site.

## II.

The owners also contend that the trial court erred in construing the contract in such a way as to conclude that they breached it. We disagree.

The trial court concluded that the owners breached the contract by unjustifiably stopping the contractor's work, wrongfully withholding progress payments on other facets of the construction, and improperly terminating the contract. The trial court also concluded that the owners' demands for changes in the work were invalid because they were not issued in accordance with the contract documents, namely, by change orders. The owners counter that specific terms of the contract permitted them to take the actions they did and that a duty of good faith and fair dealing cannot override those specific contract terms.

Again, we defer to a trial court's findings of fact that are supported by the record, but review its contract interpretation and conclusions of law de novo. *Shands v. Wm. R. Winton, Ltd.,* 91 P.3d 416, 418 (Colo.App. 2003).

### A.

■ The owners argue that the contract allowed them to stop all work because of the contractor's failure to remedy the defective windows. We disagree.

AIA Condition 12.2.1.1 requires the contractor to "promptly correct [w]ork rejected . . . for failing to conform to the requirements of the [contract]." AIA Condition 2.3.1 allows the owners to stop the work or any portion thereof by written order when the contractor "fails to correct [w]ork which is not in accordance with the requirements of the [contract]." Finally, Contract § 19.2 states that time is of the essence.

The owners appear to argue that because the window repairs were delayed, the contractor failed to promptly correct the work and they were, therefore, justified in stopping the work. The contractor responds that it was in the process of correcting the work when the owners prematurely stopped the work and, therefore, the owners cannot use its failure to perform as a reason for stopping the work.

■ The pivotal issue is whether the contractor timely performed in addressing and attempting to resolve the defective window issue. "If time is of the essence, and one party does not perform in a timely fashion, the other party has a right to refuse to perform his obligations and to rescind the agreement." *Commonwealth Petroleum Co. v. Billings,* 759 P.2d 736, 738 (Colo.App. 1987). In addition, where "time is of the essence of a contract, it means that the provision of the contract which fixes the time of performance is to be regarded as a vital term of the contract. . . . Performance at or within the time specified is essential. . . ." *Johnson v. Benson,* 725 P.2d 21, 24 (Colo.App.1986) (quoting *Hopkins v. Underwood,* 126 Colo. 224, 228, 247 P.2d 1000, 1002 (1952)). However, "[i]n the absence of a specific time for performance in the contract, the law implies a reasonable time," measured by the circumstances of the case. *Adams v. City of Westminster,* 140 P.3d 8, 11 (Colo.App.2005); *see Shull v. Sexton,* 154 Colo. 311, 316, 390 P.2d 313, 317 (1964).

Here, Contract § 3.2 required the project to be "substantially complete and a certificate of occupancy delivered to the owner no later than December 16, 2003." There is no evidence in the record that the "substantially complete" date was in jeopardy at the time the work was stopped by the owners on July 16, 2003.

The contract does not, and as a practical matter could not, fix an earlier time than substantial completion within which field repairs must be completed. The trial court found, with support in the record, that the contractor's plan to require the vendor to implement the repairs was reasonable. The trial court also found that the contractor and vendor were in the process of remedying the defective windows at the time work was stopped by the owners. It further found that the contractor and the vendor remained willing and able to complete the repairs throughout the duration of the dispute, which extended into November 2003. The trial court then concluded that the contractor had

not failed to perform, but rather had been prevented from performing by the owners.

Deferring to the trial court's findings of fact, we conclude that the record and the contract documents support the trial court's conclusions that the contractor's performance was reasonable and that the owners breached the contract by stopping the work.

## B.

■ The owners next argue that the contract allowed them to withhold all progress payments based on the contractor's failure to remedy the defective windows. We disagree.

Contract § 7.3 allows the owners to withhold progress payments for "[d]efective work not remedied." AIA Condition 9.5.1 allows the owners to withhold progress payments, "in whole or in part," if defective work is not remedied. However, according to AIA Condition 4.3.3, when a dispute results in a claim, defined as a written demand by a party seeking adjustment or interpretation of the contract, the contractor shall continue to work and the owners shall continue to make progress payments until the dispute is resolved. The record shows that the owners submitted a claim for the defective windows approximately one month after barring the contractor from the job and approximately one week after they announced that they were withholding all progress payments.

For the reasons set forth above, we agree with the trial court's conclusion that the owners prevented the contractor from remedying the window defects. In addition, we can find no support in the contract documents for the withholding of progress payments for unrelated work.

The owners argue that the trial court effectively eliminated the two sections of the contract that allowed the owners to withhold progress payments when it concluded that AIA Condition 4.3.3 obligated the owners to continue paying the contractor throughout the dispute. While this argument may have merit in a different context, here, the owners' breach of the contract by wrongfully withholding progress payments and preventing the contractor's performance is dispositive, and we need not reach this aspect of contract

interpretation. *See Mitchell v. Ryder*, 104 P.3d 316, 321 (Colo.App.2004).

Therefore, for the reasons set forth here and previously, we conclude that the owners wrongfully withheld progress payments.

## C.

■ The owners next argue that they were allowed to terminate the contract based on the contractor's failure to remedy the defective windows and on the contractor's abandonment of the project. The trial court did not find or conclude that the contractor abandoned the project; indeed, quite the opposite occurred. Therefore, in light of our previous discussion, we need not address the owners' contention that the contractor abandoned the project. *See American Drug Store, Inc. v. City & County of Denver*, 831 P.2d 465, 468 (Colo.1992).

The trial court, having concluded that the owners first breached the contract by wrongfully stopping the contractor's work and withholding the progress payments, provided an adequate legal basis for concluding that the contractor did not breach the contract, and thus, we need not address any additional reasons the trial court may have offered to support its conclusions.

## D.

The owners argue that the trial court erred in determining that the implied covenant of good faith and fair dealing prohibited them from exercising their contract rights. We disagree.

Our review of the record leads us to conclude that the trial court relied on the duty of good faith and fair dealing not to determine whether the owners breached the contract, but to determine whether the breach was material. Therefore, we find no error. *See* Restatement (Second) of Contracts § 241 (1981); *see also Pack v. Case*, 30 P.3d 436, 441–42 (Utah Ct.App.2001).

## E.

■ The owners finally argue that the trial court erred in determining that the contract did not allow them to direct the manner

in which the contractor remedied the defective windows. We disagree.

At the outset, under the contract documents, the contractor is responsible for the cost of, and is at risk for, the repairs. It would seem incongruous under the circumstances presented here to conclude that the owners can dictate the manner of repair.

AIA Condition 1.1.1 governs modifications to the contract and defines a modification as a written amendment to the contract, a change order, a change directive, or a written order for a minor change issued by the architect. AIA Condition 7.2.1 defines a change order as a written instrument signed by the architect, owner, and contractor that describes the change in the work and the resulting changes in the cost and time for the project. AIA Condition 7.3.1 defines a change directive as a written order signed by the architect and owner directing a change in the work prior to agreement on cost and time adjustments. AIA Condition 7.3.4 directs the contractor, in response to a change directive, to promptly proceed with the change and inform the architect of any concerns about adjustments in cost and time. AIA Condition 7.3.8 then provides that, pending final determination of the total cost of the change, amounts not in dispute for such change in the work shall be included in subsequent progress payments.

The owners argue that e-mails they sent on May 15, July 10, July 15, and July 18 constituted valid change directives requiring the contractor to replace the windows. By this we assume, because the owners do not expressly so state, that the owners believe the trial court erred in overlooking the contents of these e-mails.

■ "In an appeal of a judgment entered after trial to the court, we defer to the trial court's credibility determinations and will disturb its findings of fact only if they are clearly erroneous and are not supported by the record." *Skyland Metro. Dist. v. Mountain W. Enter., LLC,* 184 P.3d 106, 115 (Colo. App.2007); *see* C.R.C.P. 52.

Assuming, without deciding, that an e-mail, or series of e-mails, can constitute a written and signed change directive under the terms of the contract, we conclude that the four e-mails are not sufficiently clear to constitute a change directive.

First, the May 15, 2003 e-mail demanding replacement was apparently supplanted by a May 30, 2003 e-mail stating that the owners would allow the contractor to work with the vendor to correct the window problems.

Next, the July 10, 2003 e-mail appears to approve of the plan to repair the windows: "I strongly suggest you not continue with the finishes (granite, sinks, faucets, plaster, flooring) until the windows are repaired. The seals do not meet the specifications spelled out by [the architect], as you know. They will need to be replaced with watertight seals."

The July 15, 2003 e-mail seems to be a demand to refrain from installing faucets under the windows, but also adds, "As you are aware now and have been for some time, the windows are defective and need to be replaced."

Finally, the July 18, 2003 e-mail, which addresses another matter, states: "The windows need to be replaced first." However, as of July 16, 2003, the owners had barred the contractor from the property with an e-mail that stated: "On [advice] of counsel we are unable to give you or your subcontractors permission to work on the windows or visit the jobsite." So, even if the contractor would have followed the most recent e-mail directives, it was prevented from doing so by the owners.

Therefore, we find no reversible error in the trial court's overlooking of the e-mails, if indeed it did, that might have constituted change directives.

In summary, we find no reversible error in the trial court's interpretation of the contract and in its conclusion that the owners and not the contractor breached it.

III.

■ With respect to their claims against the vendor, the owners contend that the trial court erred in its construction of sections 4–2–508 and 4–2–608, C.R.S.2007. A seller's right to cure when the buyer revokes accep-

tance under section 4–2–608 is a matter of first impression in Colorado. We conclude that the trial court was correct in its result, but not in its reasoning.

We conclude that the owners properly revoked their acceptance under section 4–2–608 but then subsequently reaccepted the windows on the condition the defects would be cured, thereby precluding any claim for breach of warranty until the vendor had been afforded a reasonable opportunity to cure.

At the outset, we recognize that it seems incongruous to consider the vendor's right to cure when we have already concluded that the contractor had a right to cure the defective windows. However, the record shows that both the contractor and an owner signed the purchase agreement with the vendor, and that the owner directly paid the vendor for the windows. Moreover, as the owners of the house into which the windows were set, the owners have the right to bring independent breach of warranty claims against the vendor. *See* § 4–2–318, C.R.S.2007 (seller's warranty extends to anyone who uses, consumes, or is affected by the goods).

In its bench ruling, the trial court concluded that the vendor had breached both an express warranty and the implied warranty of merchantability and further concluded that Colorado does not recognize a right to cure. The vendor then moved for a judgment notwithstanding the verdict, arguing that courts in other jurisdictions have recognized a vendor's right to cure prior to a breach of warranty claim pursuant to Uniform Commercial Code (UCC) sections 2–508 and 2–608, codified in Colorado as sections 4–2–508 and –608.

The trial court concluded that section 4–2–508 was not applicable because the owners did not reject the windows on delivery. The parties do not dispute this conclusion. The trial court also concluded that it need not address a vendor's right to cure under section 4–2–608 because the owners failed to revoke acceptance and did not make the windows available for removal by the vendor. Relying on cases cited by the vendor, the trial court then concluded that a vendor has a right to cure a nonconforming product before a buyer may assert a claim for breach of warranty. *See Fitzner Pontiac–Buick–Cadillac, Inc. v. Smith,* 523 So.2d 324, 327–28 (Miss.1988); *Wilson v. Scampoli,* 228 A.2d 848 (D.C.Ct.App.1967).

The owners argue on appeal that the trial court misapplied section 4–2–608 by concluding that they failed to notify the vendor of their revocation of acceptance and that they did not make the windows available to the vendor for removal. They also argue that Colorado does not recognize a general right to cure in revocation of acceptance or in breach of warranty claims.

Generally, we affirm a judgment notwithstanding the verdict only if the evidence is such that reasonable persons could not reach the same conclusion as the jury, or, in this case, as the trial court. *W. Fire Truck, Inc. v. Emergency One, Inc.,* 134 P.3d 570, 578 (Colo.App.2006). However, here, the trial court reversed its prior judgment on a matter of law. We, therefore, defer to the trial court's findings of fact if supported by the record and review its conclusions of law de novo. *Shands,* 91 P.3d at 418.

Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects. It is not effective until the buyer notifies the seller of it.

§ 4–2–608(2), C.R.S.2007. A sufficient notice of revocation apprises the seller that the buyer wants to return the goods and receive a substitute or money in return. *Cissell Mfg. Co. v. Park,* 36 P.3d 85, 89 (Colo.App.2001). However, once a buyer revokes acceptance, any act inconsistent with the seller's ownership of the goods may constitute a reacceptance. § 4–2–606(1)(c), C.R.S.2007; *see Moeller Mfg., Inc. v. Mattis,* 33 Colo.App. 300, 304, 519 P.2d 1218, 1220 (1974). When the buyer reaccepts the goods with the understanding that the seller will cure the defect, the buyer must then afford the seller an opportunity to cure the defect before revoking acceptance or claiming a breach of warranty. § 4–2–608(1)(a), C.R.S.2007; *Gigandet v. Third Nat'l Bank,* 333 So.2d 557, 559

(Ala.1976); *U.S. Roofing, Inc. v. Credit Alliance Corp.*, 228 Cal.App.3d 1431, 279 Cal. Rptr. 533, 540 (1991); *Belfour v. Schaumburg Auto*, 306 Ill.App.3d 234, 239 Ill.Dec. 383, 713 N.E.2d 1233, 1238 (1999); *see also* James J. White & Robert S. Summers, *Uniform Commercial Code* § 8–5, 579 (5th ed.2006).

■■■ The trial court concluded that the owners presented no evidence that they revoked their acceptance of the windows and notified the vendor accordingly. However, as the owners point out, the trial court found that "[a]s early as May 15, 2003, the owners had determined that they wanted the windows replaced with another product." One of the owners communicated this intention to the contractor and it was discussed four days later in an e-mail that was copied to the vendor. Under the generous notification standards applicable to consumers, this constitutes sufficient notice of revocation. *See* § 4–2–608 cmt. 5; § 4–1–202(a)(3), C.R.S. 2007 (a person has notice of a fact when, from the facts and circumstances, that person has reason to know it exists); *Cardwell v. Int'l Housing, Inc.*, 282 Pa.Super. 498, 423 A.2d 355, 361–62 (1980).

■■■ Shortly thereafter, however, the owners equivocated. The record shows that they agreed to allow the vendor to repair the windows on May 30, 2003 and reaffirmed that decision on June 19, 2003. Lists of window defects needing repair were then communicated to the vendor in June and early July. Asking a seller to repair goods that have been rejected is inconsistent with the seller's ownership of the goods and constitutes reacceptance of defective goods. *See* Lary Lawrence, *Lawrence's Anderson on the Uniform Commercial Code* § 2–601:40, at 98–99 (3d ed.2006); *see also Bora Mach. & Die Works, Inc. v. Clark Lift of New York, Inc.*, 108 Misc.2d 591, 437 N.Y.S.2d 1011, 1015 (City Civ.Ct.1981).

After withdrawing their demand for substitute windows and acquiescing to the vendor's repair proposal, the owners accepted the defective goods on the condition that the defects would be cured, as described in section 4–2–608(1)(a). Under these circumstances, the UCC recognizes a seller's right to cure

the defect before the buyer may, or may again, revoke acceptance or claim a breach of warranty. Lawrence, § 2–608:111, at 565; *see Champion Ford Sales, Inc. v. Levine*, 49 Md.App. 547, 433 A.2d 1218, 1222 (1981). Thus, the vendor here had a right to attempt to cure the defective windows once the owners acquiesced to the repair proposal.

We recognize that a claim for revocation of acceptance is distinct from a claim for breach of warranty and that the owners appear to have asserted both claims. *See* § 4–2–608 cmt. 1. We also, consistent with the owners' assertions, have found no cases that recognize a general right to cure prior to the assertion of a breach of warranty claim. Both of the cases relied on by the trial court involved revocation of acceptance or rejection claims and not general breach of warranty claims. *See Fitzner*, 523 So.2d at 327–28 (revocation of acceptance); *Wilson*, 228 A.2d 848, 849–50 (rejection decided under § 2–508).

However, as here, when the seller has a right to cure, it would be a violation of the duty of good faith and fair dealing to foreclose that right prematurely and then assert a claim for breach of warranty. *See* § 4–1–304, C.R.S.2007 (every contract under the UCC imposes an obligation of good faith in its performance or enforcement); *Cardwell*, 423 A.2d at 365–66 (purchaser's continuing to use and pay for a rejected mobile home lulled seller into believing the owners reaccepted, violating a duty of good faith). In addition, approval of such conduct would be inconsistent with Colorado case law holding that a plaintiff asserting a breach of warranty claim against a seller with a right to limit warranty remedies must show that the product was defective, that the defendant had an opportunity to cure, that he or she failed to do so, and that damages ensued. *Cooley v. Big Horn Harvestore Systems, Inc.*, 813 P.2d 736, 744 n. 7 (Colo.1991).

The owners' reliance on *Jackson v. Rocky Mountain Datsun, Inc.*, 693 P.2d 391 (Colo. App.1984), is misplaced. There, the car dealer made repeated unsuccessful attempts to repair the buyer's car before she revoked her acceptance. *Id.* at 393. Here, while the investigation of the problem was somewhat

extended, the vendor was still attempting to effectuate its first field remedy when the owners barred it from the building site. The owners have not cited, and we have not found, any evidence in the record that the vendor declared the problems remedied, or irremediable, before it was barred from the site.

As previously discussed, the trial court found that the owners prevented the vendor from curing the window defects by unreasonably barring it from the property after July 16, 2003. Therefore, although we reach our conclusion by other reasoning, we agree with the trial court that the owners interfered with the vendor's right to cure the window defects and thus, are barred from again revoking their acceptance or asserting a breach of warranty claim.

Accordingly, we affirm the trial court's judgment in favor of the vendor.

## IV.

The owners also contend that the trial court erred in awarding attorney fees to the vendor pursuant to section 13–17–102. We disagree.

In their second amended complaint, the owners asserted claims against the vendor for negligent misrepresentation; violations of the CCPA; negligent design, manufacture, and distribution; indemnification; contribution; and negligence. Later, the owners moved to file a third amended complaint that included third-party claims against the vendor for negligence, breach of contract, breach of warranties, negligent misrepresentation, promissory estoppel, CCPA violation, civil conspiracy, and breach of the Magnuson–Moss Federal Warranty Act, 15 U.S.C. § 2304. The trial court denied the motion to amend.

In their trial brief, the owners then stated that they "assert claims against [the vendor] for, *inter alia,* breach of express and implied warranties under the UCC, misrepresentation, negligence, and violation of the [CCPA]." (Emphasis added.) The brief discussed only the four listed claims. The vendor's trial brief addressed all the claims asserted in the owners' second amended complaint. At the close of evidence, the trial court dismissed the misrepresentation claim because the owners had presented no evidence of a knowing misstatement of fact. It also dismissed the negligence claim for lack of a duty of care with respect to a window vendor for performance of the goods, and for lack of evidence of negligence. In its bench ruling, the trial court dismissed the CCPA claim because there was no evidence that the vendor made a knowingly false representation regarding the windows. In a subsequent written order, the trial court dismissed the owners' indemnification and contribution claims for lack of evidence.

The vendor then moved for assessment of costs and attorney fees on the theory that the claims dismissed were groundless and frivolous. The trial court concluded that, except for the warranty claims, all the owners' claims were frivolous or groundless and accordingly ordered the owners to pay half of the vendor's attorney fees.

We review an award of attorney fees for abuse of discretion. § 13–17–103(1), C.R.S. 2007; *Bd. of County Comm'rs v. Kraft Bldg. Contractors,* 122 P.3d 1019, 1022 (Colo.App. 2005). A "court shall assess attorney fees if, upon the motion of any party or the court itself, it finds that an attorney or party brought or defended an action, or any part thereof, that lacked substantial justification." § 13–17–102(4), C.R.S.2007. As used here, "lacked substantial justification" means "substantially frivolous, substantially groundless, or substantially vexatious." *Id.* A claim is frivolous if "the proponent can present no rational argument based on the evidence or law in support of that claim." *W. United Realty, Inc. v. Isaacs,* 679 P.2d 1063, 1069 (Colo.1984). A claim is groundless if "the allegations in the complaint, while sufficient to survive a motion to dismiss for failure to state a claim, are not supported by any credible evidence at trial." *Id.*

### A.

As to the negligence claims, the owners argue that it is undisputed that the vendor was a subcontractor who owed a duty

of care to them. As to the CCPA claim, the owners argue they presented substantial evidence supporting their claim in the form of the purported window distributor's letter stating that it ceased doing business before the vendor faxed a warranty printed on its letterhead to the owners, and the fact that the warranty as faxed contained only one of two pages, the second of which contained disclaimers to which the owners objected. They argue the same evidence supports their negligent misrepresentation claim.

The vendor argues that the owners provided no evidence that the vendor was a subcontractor and in fact, Contract § 11.1 defines a subcontractor as a "person who has a direct contract to work with the [c]ontractor to perform any of the work." The vendor further notes that the court found the vendor to be a merchant and not a subcontractor. It also argues that the owners provided no evidence of public impact of any purported action, which is a necessary element in any CCPA claim, or of any knowingly false statement of fact on its part. We agree.

The owners have not cited, and our review of the record has not revealed, any evidence that the vendor had a direct contract with the contractor, that it knew the window distributor was out of business prior to its ordering the windows, or that it knew of problems with the manufacturer. Because the owners failed to prove an essential element of each of these claims, we find no abuse of discretion in the trial court's finding them groundless.

### B.

■ Finally, the owners argue that the trial court erred by not considering section 13–17–103(1)(b), C.R.S.2007, which requires the trial court to consider a party's effort to eliminate claims found not to be valid. They argue that they attempted to drop their prior claims for common law fraud, contribution, indemnification, and negligent manufacture and design with the filing of their third amended complaint, which was rejected by the court. They then argue that they expended no further resources on the claims and that there is no evidence, other than a few lines in its trial brief, that the vendor did either.

■ We conclude that "effectively abandoning" a claim by not pursuing it through trial is insufficient to constitute an effort to reduce the number of claims found not to be valid. The owners could have filed a motion pursuant to C.R.C.P. 41 to dismiss at almost any time prior to trial. They also had opportunities during the trial to move the trial court to dismiss those claims and did not avail themselves of those opportunities. The owners' dereliction to dismiss those claims imposed unnecessary effort on the vendor. Therefore, we find no abuse of discretion in the trial court's conclusion that the owners asserted frivolous and groundless claims that justified the award of attorney fees to the vendor.

### V.

■ The contractor requests an award of attorney fees and costs incurred on appeal. Because the contractor is the prevailing party on appeal, it is entitled to an award of its reasonable attorney fees and costs under the prevailing party cost-shifting provision contained in Contract § 15.1. We exercise our discretion pursuant to C.A.R. 39.5 and remand the case to the trial court to determine the contractor's reasonable attorney fees and costs incurred on appeal.

The judgment is affirmed, and the case is remanded for a determination of the contractor's reasonable appellate attorney fees and costs.

Judge CARPARELLI and Judge LOEB concur.